UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

ISAAC KODSI,

                                                Case No. 13-40134-LMI
                                                Chapter 7


        Debtor.
_____/

BARRY E. MUKAMAL, CHAPTER 7
TRUSTEE FOR THE ESTATE OF ISAAC
KODSI,

        Plaintiff,                              Adv. Pro No. 14-01830-LMI

v.

ISAAC KODSI, and TERA MENENDEZ
KODSI,

        Defendants.
_____/

**SECOND AMENDED COMPLAINT**
**OBJECTING TO HOMESTEAD AND TENANCY BY THE ENTIRETIES EXEMPTION**
**OF DEBTOR AND HIS SPOUSE, TURNOVER, AND SALE OF PROPERTY**

        Barry E. Mukamal, the Chapter 7 Trustee (the *"Trustee"*) for the bankruptcy estate of

Isaac Kodsi (the *"Debtor"*), by and through his undersigned counsel, files this Second Amended

Complaint (the *"Complaint"*) objecting to the homestead and tenancy by the entireties (*"TBE"*)

exemption claims of the Debtor and Tera Kodsi (*"Tera Kodsi"*) and for the sale of property, and

in support states as follows:

**I.      PARTIES, JURISDICTION AND VENUE**

        **A.  Parties**

        1.      The Trustee is the duly authorized and acting Chapter 7 Trustee of the Debtor's

estate created pursuant to Section 541 of the Bankruptcy Code.

2.      The Debtor is a debtor under the provisions of chapter 7 of the Bankruptcy Code.

3.      Tera Kodsi is the Debtor's spouse, is *sui juris*, and is a stay-at-home mother.

**B.  Jurisdiction and Venue**

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334(b).

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), (N) and (O).

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    GENERAL ALLEGATIONS

### Procedural Background

7.       On December 20, 2013 (the **_"Petition Date"_**), this case was commenced by the filing of an involuntary petition for relief under the Bankruptcy Code by petitioning creditors: LAE NYY, LLC; Russell Pergament, and First Southern Bank (the "**_Main Case_**").   The petitioning creditors alone hold over $11,000,000 in liquidated claims against the Debtor.

8.      March 28, 2014, the Debtor consented to an order for relief and the Court entered the Order for Relief in Involuntary Case and Order Setting Deadline for Filing Schedules, Statements and Other Documents. *See* Main Case ECF No.27.

9.      On April 1, 2014, the Trustee was appointed as the duly authorized and acting Trustee of the Debtor's bankruptcy estate.  *See* Main Case ECF No. 32.

### Factual Background

### <u>KIT Financial</u>

10.      The Debtor is an attorney licensed by the Florida Bar who received his law degree from St. Thomas University in 1993, who later became a real estate developer and lender.

11.     In 1998, the Debtor incorporated KIT Financial Services, Inc. d/b/a Ark Financial Group ("***KIT***").

12.     The Debtor, through KIT, raised millions of dollars from investors solicited by the Debtor (***"Investors"***), which monies KIT allegedly invested in real estate projects or companies belonging to the Debtor, or lent to friends of the Debtor who were involved in the real estate business.

13.     The Debtor was introduced to a number of these Investors through his practice of law, as well as through networking and friends.

14.     By virtue of the close and person-to-person interactions the Debtor had with his potential Investors, a relationship of trust and confidence among the Debtor and KIT's Investors was created.

15.     The Debtor has testified that the Investors would make a principal investment into KIT, and would receive interest-only payments under a promissory note given to the Investor by KIT for the life of the "investment."  The interest only payments were usually 15% per month.

16.     As part of the solicitation of Investors, and aside from KIT giving the Investors a promissory note promising a high fixed return of interest, the Debtor personally guaranteed the investments/loans made to KIT by the Investors.

17.     It follows that the "investments" had a family resemblance to securities, and were thus securities under the Securities Act of 1933, the Securities Exchange Act of 1934 and Florida securities laws.

## The Debtor and His Companies Begin to Suffer Financial Difficulties

18.     Up through 2008, the Debtor lived an extravagant and lavish lifestyle due to the rise in the real estate industry.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

19.    In mid-2008, and as a result of the real estate collapse, the Debtor's businesses began to suffer financial difficulties, and at least through KIT, the Debtor was not able to raise monies from additional investors.

20.    As such, in September, 2008, the Debtor wrote to the Investors of KIT, as follows:

> Dear Investors,
>
> Enclosed please find a partial payment for September 1, 2008.
>
> Due to the significant external factors the environment has created a number of challenges for the company. Ark Financial has not been spared from the economic downturn currently affecting the United States and in particular our industry.
>
> As a matter of prudence no interest payments will be paid effective October 1, 2008, until sufficient progress has been made. I am actively working through the issues at the current time to reach resolutions. As the company restructures its finances and gets itself back on better footing, then it can permit itself to resume payments.
>
> I look forward to discussing with you the current situation in detail. Please call me at your earliest convenience
>
> Sincerely yours,
>
> Isaac Kodsi

(the *"Investor Letter"*). A copy of the Investor Letter is attached as **Exhibit A**.

21.    As a result of the "financial difficulties" suffered by the Debtor's businesses, numerous lawsuits were filed against the Debtor.  For example:

-    On June 10, 2008, the Debtor was sued by Compass Bank for breach of a personal guaranty, which ultimately resulted in a judgment against the Debtor for $3,960,994.64 on December 16, 2009;

-    On May 5, 2009, the Debtor was sued by a group of individuals who purchased properties in a real estate development owned by the Debtor known as Villa

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Francine, for among other things, negligent misrepresentation and deceptive and unfair trade practices;

- On August 10, 2009, the Debtor was sued by LAE NYY, LLC, regarding a failed real estate project, which ultimately resulted in a judgment against the Debtor for $7,233,712.47 on April 26, 2010;

- On August 27, 2009, the Debtor was sued by GEM Resources, LLC, regarding a failed real estate project known as Cypress Bay;

- On November 20, 2009, the Debtor was sued by Frank Perrone, an investor in a real estate project owned by the Debtor known as the "Oakland Park Project," for among other things, negligent misrepresentation, fraudulent inducement, Florida Securities Registration Violation, Florida Securities Fraud and Fraudulent Inducement;

- On January 29, 2010, the Debtor was sued by Hillcrest Bank for breach of a personal guaranty, which lawsuit ultimately resulted in a judgment against the Debtor for $11,344,198.99 on November 18, 2010;

- On November 5, 2010, the Debtor was sued by Susan Giveon, an investor in KIT, for among other things, breach of fiduciary duty, fraud, and civil theft, which ultimately resulted in a judgment (agreed) being entered against the Debtor in the amount of $1,230,469.16 on November 15, 2011;

- On December 22, 2010, the Debtor was sued by the John D. Cavo Revocable Trust, another investor in the real estate project owned by the Debtor known as the "Oakland Park Project," for among other things, negligent misrepresentation, fraudulent inducement, Florida Securities Registration Violation, Florida Securities Fraud and Fraudulent Inducement; and

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

- On September 13, 2011, the Debtor was sued by Jason Brady, an investor in KIT, for among other things, fraud (which included an allegation that the Debtor operated a Ponzi scheme through KIT).

22.    Despite such lawsuits and numerous Investors losing the money they had invested with the Debtor or his companies (some of which lost the majority of their life savings), which investments the Debtor personally guaranteed, the Debtor continued to lead an extravagant and lavish lifestyle.

**The Debtor Doubles Down on His Homestead
Despite the Millions He Owes to his Investors, and Opens a
TBE Account with Tera Kodsi in an Effort to Hinder, Delay, or Defraud his Creditors**

23.    The Debtor's Schedule A lists as his homestead a property located at 4412 North Bay Road, Miami Beach, Florida 33140 (the ***"Real Property"***), which in turn he has claimed exempt on Schedule C as both his homestead and owned TBE with Tera Kodsi.

24.    The Debtor purchased the Real Property, as husband and wife with Tera Kodsi, on October 18, 2005 for approximately $3,500,000.

25.    The Real Property is located on Biscayne Bay, and currently has 9,245 square feet of living area, and has eight bedrooms and seven bathrooms.

26.    The value of the Real Property today is approximately $14,000,000.

27.    Seeing the financial collapse of his companies and the impending flurry of lawsuits by investors and lending institutions, the Debtor implemented a complex asset protection and conversion plan in order to keep his assets out of the reach of his creditors (the ***"Asset Conversion Scheme"***).

28.    In furtherance of the Asset Conversion Scheme, in April 2008, and though allegedly unable to pay his Investors in 2008, the Debtor took out a $6,475,000 loan (the "***NT Loan***") with Northern Trust Bank, N.A. ("***Northern Trust***") to refinance the existing $3,160,000

loan on the Real Property. The Debtor was to use approximately $2,700,000 of the NT Loan to build an addition and renovate (the *"Improvements"*) the Real Property (the *"Improvement Funds"*) pursuant to a Construction Loan Agreement (the *"Construction Loan Agreement"*) entered into between himself and NT.

29.    The Construction Loan Agreement provided at Article II Section (c) that the Debtor was to use the proceeds "only for the payment of costs directly associated with the construction of the Improvements and shall not divert such funds for any other purpose."

30.    As of August 31, 2007, the Debtor valued the Real Property at $5,500,000.

31.    The Construction Loan Agreement between the Debtor and Northern Trust, at Exhibit B, states that the anticipated value of the Real Property after the addition and renovation was complete would be $9,250,000.

32.     The Debtor's contractor was a company owned by his brother-in-law (the *"Contractor"*).

33.    In order to pay the Contractor, the Debtor would present draws from the Contractor to Northern Trust.  When Northern Trust was prepared to fund the payment for the draw (the *"Draw Funds"*), which Draw Funds came from the Improvement Funds, the Debtor had Northern Trust deposit the Draw Funds in the account of Ark Development/Oceanview, LLC, at Northern Trust (the *"Ark Development Account"*).

34.    Ark Development/Oceanview, LLC, is owned by the Debtor and his father.

35.    Thereafter, the Debtor wire transferred the Draw Funds from the Ark Development Account to his personal individual account, which monies he commingled with other funds in his personal individual account.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

36.     Once such Draw Funds reached the Debtor's personal individual account, the Debtor used some of the Draw Funds to fund the Contractor's draw request, and would also use the Draw Funds for his own personal expenses.

37.     For example, the Debtor used some of the Draw Funds to pay for his Bentley and one of his children's tuition.  In addition, the Debtor transferred Draw Funds to another account in his name, to his entity, K.I.T. Financial Services, and to Merrill Lynch.

38.     The Debtor first began to use the Improvements Funds on September 29, 2008, which was the same month the Debtor sent the Investor Letter to his Investors in KIT, and months after the Debtor had been sued by Compass Bank.

39.     The Debtor breached the Construction Loan Agreement because he used the Draw Funds for purposes other than the payment of costs directly associated with the construction of the Improvements on the Real Property.

40.     Once the Draw Funds reached the Debtor's account, the Debtor had control of the Draw Funds because he had the power to designate which party would receive the Draw Funds, and he had the power to actually disburse the Draw Funds.

41.     Once the Draw Funds were transferred by the Debtor to his personal individual account, they were non-exempt property of the Debtor.

42.     Rather than utilize the Improvements Funds from the NT Loan (the **"NT Loan Proceeds"**) to repay Investors and his other creditors, the Debtor used such monies to improve the Real Property, thereby increasing his equity in his allegedly exempt homestead.

43.     The Debtor knew that by increasing the equity in the Real Property, such equity could be protected as homestead or TBE property, and therefore kept out of the reach of his creditors.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

44. Northern Trust holds a first mortgage against the Property in the amount of $6,065,069. The Debtor is current on the mortgage, and the monthly mortgage payment on the NT Loan is approximately $32,500.

45. Also in furtherance of the Asset Conversion Scheme, and as a result of his personal accounts being garnished, the Debtor opened a TBE account with Tera Kodsi, his wife (an insider), at Wells Fargo on January 4, 2011 (the *"WF TBE Account"*).

46. The opening deposit into the WF TBE Account was made by KIT.

47. The purpose of the WF TBE Account was to shield his monies from his creditors by virtue of the TBE designation.

48. The majority of the monies that funded the WF TBE Account came from KIT, other companies owned by the Debtor, the Debtor's law firm, the Debtor himself, and companies allegedly owned by the Debtor's mother or his family, which monies total more than $2,100,000 (the *"WF Monies"*) since the opening of the WF TBE Account.

49. None of the WF Monies were exempt, or were attributable or earned by Tera Kodsi.

50. In addition, and in furtherance of the Asset Protection Scheme, Tera Kodsi opened an account in her own name only at Wells Fargo on July 15, 2011 (the *"Tera Kodsi Account"*).

51. The majority of the monies that funded the Tera Kodsi Account came from the TBE Account, cash deposits (totaling $146,496.50), the Debtor's law firm, and companies allegedly owned by the Debtor's mother or his family, which monies total more than $747,000 since the opening of the Tera Kodsi Account (the *"Tera Kodsi Account Monies"*).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

52.    All of the Tera Kodsi Account Monies came from the Debtor or entities he owns or is affiliated with, and none of the Tera Kodsi Account Monies are exempt or attributable to Tera Kodsi.

53.    At all times, the Debtor retained possession or control of the WF TBE Account and Tera Kodsi Account.

54.    At all material times, the Debtor has been insolvent.

55.    Since 2009, the Debtor's monthly expenses have totaled approximately $50,000, which expenses he has continued to pay through today despite the numerous judgments entered against him and the monies he owes Investors.

56.    Between May 2010 and March 2014, the Debtor, or entities and bank accounts he controls (including the WF TBE Account and Tera Kodsi Account), have transferred (at least) $1,496,837.19[1] to Northern Trust in payment of the NT Loan (the ***"Homestead Transfers"***). Attached as **SCHEDULE 1** is a schedule setting forth the Homestead Transfers.

57.    During the period in which the Homestead Transfers were made, the Debtor had unsecured debts between $10 Million and $30 Million.

58.    During such time, the Debtor was not paying his unsecured creditors, other than repaying insiders, such as his former law partner, Neil Eisenstein.

59.    Still, the Debtor continually made payments of his $50,000 per month in fixed expenses, including the Homestead Transfers, in an effort to hinder, delay, and defraud his creditors.

60.    The Debtor's Homestead is not reasonably necessary for his and his family's support.

---

[1] The Trustee is still reviewing bank records for accounts the Debtor has owned or controlled. Therefore, this amount may increase if new transfers are discovered.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

61.     At all times prior to being put into an involuntary bankruptcy case, the Debtor has engaged in a continued pattern of "sharp dealing."

## Investor Lawsuits Against the Debtor

### The Brady Complaint

62.     On September 13, 2011, Jason Brady sued the Debtor in Broward County Circuit Court for (*inter alia*) securities fraud (the ***"Brady Action"***). A copy of the complaint (the ***"Brady Complaint"***) in the Brady Action is attached as __Exhibit B__.

63.     The Brady Action arose out of the Debtor's investment business through KIT.

64.     The Brady Complaint alleges that the "investments" were actually used in furtherance of a Ponzi scheme.

65.     Specifically, the Brady Complaint alleges that "Defendant Kodsi ran a Ponzi scheme in which money was invested by the Plaintiff and others were paid interest from the subsequent infusion of capital and investments made by other investors."

66.     Furthermore, the Brady Complaint alleges that "Kodsi is . . . in a position of trust and used such position to dupe his . . . investors into a sense of safety. He never disclosed the risky nature of the investments he made for his clients."

67.     Finally, the Brady Complaint alleges that at "a meeting in November of 2010, Kodsi invited [Jason Brady] to seek new investors who would invest money with Kodsi. This money would then provide Kodsi the ability to make payment to [Jason Brady]."

68.     The Brady Action remains pending against the Debtor.

### The Oakland Park Project and the Cavo Action

69.     Similar to various investors in KIT, the John D. Cavo Revocable Trust has sued the Debtor and his law firm, (the ***"Cavo Action"***), in Broward County Circuit Court, for among other things, Florida Securities Fraud, Fraudulent Inducement Seeking Rescission, and Breach of

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Fiduciary Duty. A copy of the complaint (the **"Cavo Complaint"**) in the Cavo Action is attached

as **Exhibit C**.

> The Cavo Complaint alleges that: [Debtor] told the Plaintiff that he was making a real estate investment in Fort Lauderdale, Florida (the "Oakland Park Project"). [Debtor] further represented that he was only allowing a limited number of investors to participate and that there was no risk to the capital invested. Specifically, [Debtor] represented that he was raising five million dollars ($5,000,000.00) which would be used to purchase the property upon which the Oakland Park Project would be developed so that funds provided by investors such as the Plaintiff would always be secured by the value of the property upon which the Oakland Park Project would be developed. [Debtor] also represented that after making the investment, Plaintiff would enjoy an equity interest comprising 77.5 of 1,000 membership units in the Team Equity/Oakland Park LLC Investment Entity.

70.     The Cavo Complaint further alleges, *inter alia,* that the Debtor violated Florida

State securities laws and defrauded his investors in that the Debtor failed to disclose "any risks of

the Investments" and misrepresented or omitted that:

a)      that funds invested would not be applied to purchase the real property;

b)      that the Team Equity/Oakland Park LLC Investment Entity did not have

an ownership interest in the real property;

c)      that Ark Development/Oakland Park LLC, mortgaged or leveraged the

property; and

d)      the debtor had a conflict of interest.

71.     The Cavo Action remains pending against the Debtor.

**The Debtor and his Wife Have Joint
Debt and Therefore the TBE Exemption is Not Available**

72.     The Debtor exempts the Real Property as TBE property in his Schedule C.

73.     The Debtor also exempts as TBE property on his Schedule C the following

personal property: the WF TBE Account; a Wells Fargo Advisors Brokerage Account ending in

4169 valued at $113,826.83 (the "*WF Brokerage Account*"); and household goods and furnishings valued at $37,910 (the "*Household Furnishings*")(collectively, the "*Personal Property*").

74.     Hillcrest Bank n/k/a Bank Midwest ("*Bank Midwest*") is a creditor of the Debtor and his spouse, Tera Kodsi.

75.     Specifically, Bank Midwest obtained a Final Deficiency Judgment (the "*Bank Midwest Judgment*") against the Debtor in the amount of $11,103,249.59 (the "*Midwest Debt*") on November 18, 2010.  Attached as **Exhibit D** is a copy of the Bank Midwest Judgment.

76.     Bank Midwest asserts that it holds the same claim against Tera Kodsi as a result of her execution of that certain Agreement and Joinder of Spouse (the "*Tera Kodsi Guaranty Agreement*").  A copy of the Tera Kodsi Guaranty Agreement is attached as **Exhibit E**.

77.     Pursuant to the Tera Kodsi Guaranty Agreement, Tera Kodsi joined in the guaranty, to the extent of the value of her interest TBE property (as well as to the extent of other transfers and property).

78.     The Tera Kodsi Guaranty Agreement is also evidence that the Debtor and Tera Kodsi did not intend to keep any property exempt as TBE.

79.     On July 29, 2014, Bank Midwest filed proof of claim no. 10 in the Main Case (the "*Bank Midwest POC*").

80.     The Bank Midwest POC asserts a total amount due as of July 29, 2014 of $13,733,046.40.

81.     The Bank Midwest POC asserts that it is a "joint debt also owed by Debtor's spouse."

82.     No party has objected to the Bank Midwest POC.

83.     Accordingly, the Bank Midwest POC is presumptively valid.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

84.     In addition, the Debtor and Tera Kodsi also have a joint assessed tax liability for the tax years ending in 2006 in excess of $975,000, as evidenced by the Notice of Deficiency, attached as **Exhibit F** (the ***"IRS Debt"***).

85.     Moreover, the Debtor and Tera Kodsi have not filed income tax returns for 2011, 2012, and 2013.

86.     In addition, the IRS filed a proof of claim in the amount of $991,412, as claim no. 11 in the Main Case (the ***"IRS POC"***).

87.     No party has objected to the IRS POC.

88.     Accordingly, the IRS POC is presumptively valid.

89.     According to the Debtor's Statement of Financial Affairs (the ***"SOFA"***), the Debtor himself admits receiving $1,219,655.70 in income from seven different entities between 2011-2013.

90.     Thus, the tax liability alone owed by the Debtor and Tera Kodsi to the IRS is likely significant.

91.     Additionally, the Trustee is informed and believes that the Debtor and Tera Kodsi received significantly more money than the $1,219,655.70 in this three year period reported on his SOFA, as evidenced by the amount of monies deposited in the WF TBE Account (over $2.1 Million).

92.     Specifically, the Debtor routinely took monies (and still does) from companies (some of which are owned by him or others which are allegedly owned by his family members) on a monthly basis to cover his $40,000 to $50,000 monthly expenses and allegedly booked the monies from those companies as either loans or advances, or has not yet decided how to book the transfers.

93.     The unfiled tax returns, once filed, will result in significant joint debt to the IRS.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

94.     Finally, both the Debtor and Tera Kodsi guaranteed a $50,000.00 promissory note in favor of Branch Banking & Trust (**"BB&T"**), as assignee of Colonial Bank, N.A. BB&T has filed a proof of claim (the **"BB&T POC"**) for that debt in the liquidated amount of $48,892.80 (the **"BB&T Debt"**) as a claim no. 5 in the Main Case.

95.     No party has objected to the BB&T POC.

96.     Accordingly, the BB&T POC is presumptively valid.

97.     The Midwest Debt, IRS Debt, and BB&T Debt constitute joint debts of the Debtor and Tera Kodsi.

## COUNT I
## SPECIFIC OBJECTION AS TO EXEMPTION OF WF BROKERAGE ACCOUNT
### (Against Debtor and Tera Kodsi)

98.     The Trustee realleges and reincorporates the allegations in paragraphs 1 - 9 and 73 above as if fully set forth herein.

99.     The Debtor scheduled the WF Brokerage Account as

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Current Value of Property Without Deducting Exemption |
|---|---|---|---|
| Wells Fargo Advisors Brokerage Acct Acct # xxxx-4169 (co-owned with Debtor's wife) (value listed is the Debtor's 50% interest) | 11 U.S.C. § 522(b)(3)(B) | 100% | 113,826.83 |

100.    Upon opening the WF Brokerage Account, Tera Kodsi and the Debtor executed a *Securities Account Agreement Margin Account*. (the **"WF Agreement"**). A copy of the WF Agreement is attached as **Exhibit G.**

101.    Pursuant to the WF Agreement, the Debtor and Tera Kodsi checked a box which provides:

> [x] We are Joint tenants with right of survivorship and not
> tenants in common, so that in case of the death of any us, the
> entire account shall become property of the survivor or
> survivors.

(the **"JT Box"**)

102.    In checking the JT Box, the Debtor and Tera Kodsi did not check the box which

provides:

> [ ] We are tenants by the entirety if married and permitted
> under state law so that in the case of the death of one of us the
> entire account shall become property of the survivor.

(the "**Unchecked TBE Box"**)

103.    Additionally the Debtor and Tera Kodsi executed a document entitled *Joint

Tenant with Right of Survivorship* (the **"Second WF Agreement"**) as to the WF Brokerage

Account. A copy of the Second WF Agreement is attached as **Exhibit H.**

104.    Pursuant to the Second WF Agreement, the Debtor and Tera Kodsi checked (and

did not check) the following boxes

[x] Joint Tenancy with Right of Survivorship          [ ] Tenancy by the Entirety

(the **"Second Election"**).

105.    The JT Box, the Unchecked TBE Box and the Second Election clearly show that

the Debtor and Tera Kodsi did not intend to hold the WF Brokerage Account as tenants by the

entirety.

WHEREFORE, the Trustee respectfully requests this Court to enter an Order denying the

TBE exemption for the WF Brokerage Account, ordering the Debtor and Tera Kodsi to turn over

the WF Brokerage Account to the Trustee, and authorizing the Trustee to administer the WF

Brokerage Account for the benefit of the estate, and grant such other and further relief as is just

and appropriate.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

## COUNT II
## OBJECTION TO EXEMPTION OF REAL PROPERTY
## PURSUANT TO 11 U.S.C. 522(o)
### (Against Debtor and Tera Kodsi)

106.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 61 above as if fully set forth herein.

107.    The Debtor and Tera Kodsi are claiming the homestead exemption for the Real Property.

108.    This is an action objecting to the Debtor's claim of exemption for the Real Property under 11 U.S.C. § 522(b)(3)(A).

109.    The Homestead Payments were made with the intent to hinder, delay, or defraud the Debtor's unsecured creditors.

110.    The Homestead Payments came from non-exempt monies of the Debtor, and were made within ten (10) years of the Petition Date.

111.     The Homestead Payments reduced the mortgage debt owing to Northern Trust encumbering the Real Property.

112.    The value of the Debtor's otherwise exemptible interest in the Real Property has been increased due to the Homestead Payments, which were disposed of by the Debtor with the actual intent to hinder, delay, or defraud his creditors, and which could not be exempted by the Debtor.

113.    The value of the homestead exemption claimed by the Debtor and Tera Kodsi must be reduced by the amount of the Homestead Payments, which were made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

114.    The Debtor has engaged in a pattern of "sharp dealing" prior to his bankruptcy case.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

115.    The Debtor's intent to hinder, delay, or defraud his creditors is evidenced by, among other things:

(a)     The Homestead Payments were for the benefit of an insider;

(b)     The Debtor and Tera Kodsi retained custody and control of the Real Property after the Homestead Payments;

(c)     Prior to the Homestead Payments, the Debtor had been threatened with suit by numerous creditors, and the Debtor knew he had defaulted (or was about to default) on millions of dollars of guaranty payments; and,

(d)     The Debtor was insolvent at the time of the Homestead Payments.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment as follows: (i) sustaining the Trustee's objection; (ii) reducing any available exemption under 11 U.S.C. § 522(b)(3)(A) by the amount of the Homestead Payments pursuant to Section 522(o); (iii) reducing the amount of Tera Kodsi's exemptions in the Real Property by the amount of the Homestead Payments; (iv) determining that the equity available in the Real Property is not exempt up to the amount of the Homestead Payments; (v) directing the Debtor and Tera Kodsi to turn over the Real Property to the Trustee, or in the alternative, ordering the sale and partition of the Real Property, with the estate's portion of the proceeds to be distributed to the Trustee; (vi) imposing a lien in the name of and for the benefit of the Trustee against the Real Property, which lien shall be determined to be superior to the remaining interests, if any, of Tera Kodsi; and (vii) granting such other and further relief as is just and appropriate.

**COUNT III**
**OBJECTION TO EXEMPTION OF REAL PROPERTY**
**PURSUANT TO 11 U.S.C. § 522(o)**
**(Against Debtor and Tera Kodsi)**

116.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 61 above as if fully set forth herein.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

117.    The Debtor and Tera Kodsi are claiming the homestead exemption for the Real Property.

118.    This is an action objecting to the Debtor's claim of exemption for the Real Property under 11 U.S.C. § 522(b)(3)(A).

119.    The Debtor's transfer of the Improvement Funds via the Draw Funds to use for the Improvements to the Real Property were made with the intent to hinder, delay, or defraud the Debtor's unsecured creditors.

120.    The transfers of the Draw Funds to pay for the Improvements to the Real Property came from non-exempt monies of the Debtor, and were made within ten (10) years of the Petition Date.

121.    The value of the Debtor's otherwise exemptible interest in the Real Property has been increased due to the use of the Improvements Funds via the Draw Funds, which were disposed of by the Debtor with the actual intent to hinder, delay, or defraud his creditors, and which Draw Funds could not be exempted by the Debtor.

122.    The value of the homestead exemption claimed by the Debtor and Tera Kodsi must be reduced by the amount of the transfers of the Draw Funds, or the Real Property's increase in equity through today due to the Improvements, which transfers were made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

123.    The Debtor has engaged in a pattern of "sharp dealing" prior to his bankruptcy case.

124.    The Debtor's intent to hinder, delay, or defraud his creditors is evidenced by, among other things:

(a) The  use of the Improvements Funds were for the benefit of an insider;

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

(b)     The Debtor and Tera Kodsi retained custody and control of the Real Property after the Improvements;

(c)     Prior to the Improvements, the Debtor had been threatened with suit by his creditors, and the Debtor knew he had defaulted (or was about to default) on millions of dollars of guaranty payments; and,

(d)     The Debtor was insolvent at all material times.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment as follows: (i) sustaining the Trustee's objection; (ii) reducing any available exemption under 11 U.S.C. § 522(b)(3)(A) by the amount of the transfers of the Improvement Funds via the Draw Funds or the Real Property's increase in equity through today due to the Improvements; (iii) reducing the amount of Tera Kodsi's exemptions in the Real Property by the amount of the transfers of the Improvement Funds via the Draw Funds or the Real Property's increase in equity through today due to the Improvements; (iv) determining that the equity available in the Real Property is not exempt up to the amount of the transfers of the Improvement Funds via the Draw Funds or the Real Property's increase in equity through today due to the Improvements; (v) directing the Debtor and Tera Kodsi to turn over the Real Property to the Trustee, or in the alternative, ordering the sale and partition of the Real Property, with the estate's portion of the proceeds to be distributed to the Trustee; (vi) imposing a lien in the name of and for the benefit of the Trustee against the Real Property, which lien shall be determined to be superior to the remaining interests, if any, of Tera Kodsi; and (vii) granting such other and further relief as is just and appropriate.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

## COUNT IV
## OBJECTION TO EXEMPTION OF REAL PROPERTY
## PURSUANT TO 11 U.S.C. § 522(q)(1)(B)
### (Against Debtor and Tera Kodsi)

125.   The Trustee realleges and reincorporates the allegations in paragraphs 1 - 71 above as if fully set forth herein.

126.   The Debtor has elected to claim exemptions under state or local law.

127.   The Debtor and Tera Kodsi are claiming the Florida homestead exemption under 11 U.S.C. § 522(b)(3)(A), and the entireties exemption through 11 U.S.C. § 522(b)(3)(B) for the Real Property.

128.   This is an action objecting to all claims of exemption by the Debtor or Tera Kodsi for the Real Property.

129.   The debts arising from the Brady Action and Cavo Action constitute debts either:

a)   arising from a violation of the Federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934), State securities laws, or any regulation or order issued under Federal securities laws or State securities laws; or

b)   a debt arising from fraud, deceit, or manipulation in a fiduciary capacity.

130.   The Trustee is informed and believes that the Debtor owes other debts to other Investors (who may not have sued) which similarly constitute debts within the scope of 11 U.S.C. § 522(q)(1)(B).

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment as follows: (i) sustaining the Trustee's objection; (ii) reducing the exemptions under both 11 U.S.C. § 522(b)(3)(A) & (B) to a total of only $155,675; (iii) finding that the title to the Real Property vests solely in the bankruptcy estate, and that the Debtor and/or Tera Kodsi are only allowed cash payment of the total allowed amount of the exemption under 11 U.S.C. § 522(b)(3)(A) &

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

(B); (iv) directing the Debtor and Tera Kodsi to turn over the Real Property to the Trustee, or in the alternative, ordering the sale and partition of the Real Property, with the estate's portion of the proceeds to be distributed to the Trustee; (v) imposing a lien in the name of and for the benefit of the Trustee against the Real Property, which lien shall be determined to be superior to the remaining interests, if any, of Tera Kodsi; and (vi) granting such other and further relief as is just and appropriate.

### COUNT V
### OBJECTION TO TBE EXEMPTION FOR THE REAL PROPERTY
#### (Against Debtor and Tera Kodsi)

131.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 9, 23 - 26 and 72 - 97  above as if fully set forth herein.

132.    This is an action objecting to the Debtor's claim of exemption of the Real Property as TBE pursuant to 11 U.S.C. § 522(b)(3)(B).

133.    There is joint debt in this case, and therefore the Trustee objects to any exemption under 11 U.S.C. § 522(b)(3)(B).

134.    Additionally, in relevant part, the Tera Kodsi Guaranty Agreement provides as follows:

> [Tera Kodsi] agrees that any real or personal property, money effects, or other tangible or intangible property owned by [Debtor] or [Debtor and Tera Kodsi] jointly or as tenants by the entirety shall be deemed to be or to have remained the sole property of [Debtor] insofar as enforcement by Lender of its rights under the . . . Guaranty Agreement [with Debtor] is concerned.

(the **"TBE Disclaimer"**).

135.    The above-quoted language establishes that Tera Kodsi did not intend to hold any property as tenants by the entirety, but rather as separate property.

136.    Tera Kodsi's stated intent not to hold property as a tenant by the entireties establishes that she did not hold entireties property. Thus, no property is properly exempted under 11 U.S.C. § 522(b)(3)(B).

137.    In order for entireties property to be removed from the estate as exempt, the property held "as a tenant by the entirety [is exempt to the] extent that such interest as a tenant by the entirety . . . is exempt from process under applicable nonbankruptcy law. "

138.    As established by the TBE Disclaimer, Tera Kodsi agreed that any property she may have otherwise owned as a tenant by the entirety would not be "exempt from process under applicable nonbankruptcy law" by Bank Midwest.

139.    Accordingly, no property is properly exempted under 11 U.S.C. § 522(b)(3)(B).

140.    Thus, the Real Property is not exempt under 11 U.S.C. § 522(b)(3)(B)  either (1) because there is joint debt; (2) because the Real Property is not held as tenancy by the entirety; or (3) because a creditor could have issued process against the entireties interest in the Real Property.

141.    Thus, the Real Property must be turned over to the Trustee so that the Trustee can administer the Real Property for the benefit of the estate.

WHEREFORE, the Trustee respectfully requests this Court to enter an Order denying the TBE exemption for the Real Property, ordering the Debtor and Tera Kodsi to turn over the Real Property to the Trustee, and authorizing the Trustee to administer the Real Property for the benefit of the estate, and grant such other and further relief as is just and appropriate.

### COUNT VI
### OBJECTION TO TBE EXEMPTION FOR THE REAL PROPERTY BASED ON FRAUDULENT ASSET CONVERSION PURSUANT TO §222.30, FLORIDA STATUTES
### (Against Debtor and Tera Kodsi)

142.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 61 above as if fully set forth herein.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

143.    This is an action objecting to the Debtor's claim of exemption of the Real Property as TBE pursuant to 11 U.S.C. § 522(b)(3)(B).

144.    The Debtor and Tera Kodsi are claiming the TBE exemption for the Real Property.

145.    The Homestead Payments and transfer of the Improvements Funds via the Draw Funds were made with the intent to hinder, delay, or defraud the Debtor's unsecured creditors.

146.    The Homestead Payments and Draw Funds came from non-exempt monies of the Debtor.

147.    The Homestead Payments reduced the mortgage debt owing to NT associated with the Real Property, and allowed the Debtor to retain possession of the Real Property.

148.    The value of the Debtor's otherwise exemptible interest in the Real Property has been increased due to the Homestead Payments, which were disposed of by the Debtor with the actual intent to hinder, delay, or defraud his creditors, and which could not be exempted by the Debtor.

149.    The value of the homestead exemption claimed by the Debtor and Tera Kodsi must be reduced by the amount of the Homestead Payments, which were made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

150.    In addition, the value of the Debtor's otherwise exemptible interest in the Real Property has been increased due to the use of the Improvements Funds via the Draw Funds, which were disposed of by the Debtor with the actual intent to hinder, delay, or defraud his creditors, and which Draw Funds could not be exempted by the Debtor.

151.    The Debtor's intent to hinder, delay, or defraud his creditors is evidenced by, among other things:

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

(e)     The Homestead Payments and use of the Improvement Funds were for the benefit

of an insider;

(f)     The Debtor and Tera Kodsi retained custody and control of the Real Property

after the Homestead Payments and use of the Improvement Funds;

(g)     Prior to the Homestead Payments and use of the Improvement Funds, the Debtor

had been threatened with suit by numerous creditors, and the Debtor knew he had

defaulted (or was about to default) on millions of dollars of guaranty payments;

(h)     The Debtor was not paying his debts as they became due; and,

(i)      The Debtor was insolvent at the time of the Homestead Payments and use of the

Improvement Funds.

152.    Accordingly, pursuant to Section 222.30, Florida Statutes, the Real Property is not

exempt under 11 U.S.C. § 522(b)(3)(B), and must be turned over to the Trustee so that the

Trustee can administer the Property for the benefit of the estate.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment as

follows: (i) sustaining the Trustee's objection; (ii) reducing the TBE exemption by the amount of

the Homestead Payments and by the amount of the transfers of the Improvement Funds via the

Draw Funds or the Real Property's increase in equity through today due to the Improvements

and use of the Improvement Funds; (iii) reducing the amount of Tera Kodsi's TBE exemption by

the amount of the Homestead Payments and by the amount of the transfers of the Improvement

Funds via the Draw Funds or the Real Property's increase in equity through today due to the

Improvements; (iv) determining that the equity available in the Property is not exempt up to the

amount of the Homestead Payments and by the amount of the transfers of the Improvement

Funds via the Draw Funds or the Real Property's increase in equity through today due to the

Improvements; (v) directing the Debtor and Tera Kodsi to turn over the Real Property to the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Trustee, or in the alternative, ordering the sale and partition of the Real Property, with the estate's portion of the proceeds to be distributed to the Trustee; (vi) imposing a lien in the name of and for the benefit of the Trustee against the Real Property, which lien shall be determined to be superior to the remaining interests, if any, of Tera Kodsi; and (vii) granting such other and further relief as is just and appropriate.

## COUNT VII
### OBJECTION TO EXEMPTION OF PERSONAL PROPERTY
#### (Against Debtor and Tera Kodsi)

153.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 61 and 72 - 97  above as if fully set forth herein.

154.    This is an action objecting to the Debtor's claim of exemption of Personal Property as TBE pursuant to 11 U.S.C. § 522(b)(3)(B).

155.    There is joint debt in this case, and therefore the Trustee objects to any exemption under 11 U.S.C. § 522(b)(3)(B).

156.    Additionally, in relevant part, the TBE Disclaimer provides as follows:

[Tera Kodsi] agrees that any real or personal property, money effects, or other tangible or intangible property owned by [Debtor] or [Debtor and Tera Kodsi] jointly or as tenants by the entirety shall be deemed to be or to have remained the sole property of [Debtor] insofar as enforcement by Lender of its rights under the . . . Guaranty Agreement [with Debtor] is concerned.

157.    The above-quoted language establishes that Tera Kodsi did not intend to hold any property as tenants by the entirety, but rather as separate property.

158.    Tera Kodsi's stated intent not to hold property as a tenant by the entireties establishes that she did not hold entireties property. Thus, no property is properly exempted under 11 U.S.C. § 522(b)(3)(B).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

159.    In order for entireties property to be removed from the estate as exempt, the property held "as a tenant by the entirety [is exempt to the] extent that such interest as a tenant by the entirety . . . is exempt from process under applicable nonbankruptcy law. "

160.    As established by the TBE Disclaimer, Tera Kodsi agreed that any property she may have otherwise owned as a tenant by the entirety would not be "exempt from process under applicable nonbankruptcy law" by Bank Midwest.

161.    Accordingly, no property is properly exempted under 11 U.S.C. § 522(b)(3)(B).

162.    Thus, the Personal Property is not exempt under 11 U.S.C. § 522(b)(3)(B) either (1) because there is joint debt; (2) because the personal property is not held as tenancy by the entirety; or (3) because a creditor could have issued process against the entireties interest in the personal property.

163.    Thus, the Personal Property must be turned over to the Trustee so that the Trustee can administer the Personal Property for the benefit of the estate.

WHEREFORE, the Trustee respectfully requests this Court to enter an Order denying the TBE exemption for the Personal Property, ordering the Debtor and Tera Kodsi to turn over the Personal Property to the Trustee, and authorizing the Trustee to administer the Personal Property for the benefit of the estate, and grant such other and further relief as is just and appropriate.

### <u>COUNT VIII</u>
### OBJECTION TO EXEMPTION OF PERSONAL PROPERTY BASED ON FRAUDULENT ASSET CONVERSION PURSUANT TO §222.30, FLORIDA STATUTES
### (Against Debtor and Tera Kodsi)

164.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 61 above as if fully set forth herein.

165.    This is an action objecting to the Debtor's claimed 11 U.S.C. § 522(b)(3)(B) and TBE exemptions as to the Personal Property.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

166.    The Trustee objects to the Debtor's claimed TBE exemptions as to the Personal Property based upon the following:

(a)    As to the WF TBE Account and WF Brokerage Accounts, such accounts were funded and/or created with the actual intent to hinder, delay, or defraud the Debtor's creditors pursuant to and/or in violation of Section 222.30, Fla. Stat.: (i) at or around a time the Debtor and his companies were experiencing severe financial difficulties; (ii) at or around a time that the Debtor had been sued, was threatened with suit, or his creditors were attempting to collect on judgments they had entered against the Debtor; (iii) for the benefit of an insider, namely Tera Kodsi; (iv) to allow the Debtor to retain possession and control of the funds deposited into WF TBE Account and WF Brokerage Accounts by conversion into non-exempt status; (v) to allow the Debtor to dispose of substantially all of his assets by converting them into non-exempt status; (vi) at or around a time the Debtor was insolvent; and (vii) at a time the Debtor was not paying his debts as they became due; and

(b)    As to the Household Furnishings: (i) little or no funds were contributed by Tera Kodsi to purchase such assets; and (ii) the Trustee objects to the TBE exemption as to the Household Furnishings to the extent that insufficient documentation exists to support such TBE ownership of the Household Furnishings or were acquired or converted into TBE status with the actual intent to hinder, delay, or defraud the Debtor's creditors pursuant to Section 222.30, Fla. Stat.

167.    Accordingly, pursuant to Section 222.30, Florida Statutes, the Personal Property is not exempt under 11 U.S.C. § 522(b)(3)(B), and must be turned over to the Trustee so that the Trustee can administer the Personal Property for the benefit of the estate.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

WHEREFORE, the Trustee respectfully requests this Court to enter an Order denying the TBE exemption for the Personal Property, ordering the Debtor and Tera Kodsi to turn over the Personal Property to the Trustee, and authorizing the Trustee to administer the Personal Property for the benefit of the estate, and grant such other and further relief as is just and appropriate.

## COUNT IX
## SALE - 11 U.S.C. §363(h)
### (Against the Debtor and Tera Kodsi)

168.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 9, 23 - 26 above as if fully set forth herein.

169.    This is an action against Tera Kodsi seeking to obtain approval under 11 U.S.C. § 363(h) for the sale of both the prepetition interest of the Debtor and that of Tera Kodsi, a co-tenant by the entirety in the Real Property.

170.    Pursuant to Fed. R. Bankr. P 7001, "a proceeding to obtain approval under §363(h) for the sale of both the interest of the estate and of a co-owner in property" must be filed as an adversary proceeding.

171.    By virtue of the Debtor's involuntary petition under chapter 7, the estate is the owner of the Debtor's entireties interest in the Real Property.

172.    To the extent of the disallowance (in whole or in part) of the Debtor's claim of homestead exemption over the Real Property, the estate remains the owner of the Debtor's entireties interest in the Home.

173.    Pursuant to *Schwab v. Reilly*, 560 U.S. 770, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010), so long as a portion of the Debtor's interest in the Real Property is nonexempt, the estate is empowered to sell the Debtor's prepetition interest in the Real Property, and the Debtor is entitled to retain cash equivalent to the allowed amount of his exemption.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

174.    The Trustee seeks to sell the Debtor's prepetition interest and the interest of Tera Kodsi as co-owners of the Real Property.

175.    Partition in kind of the Real Property between the estate and Tera Kodsi is impractical.

176.    The Real Property is a single family home, such that there is no practicable manner of partition of such property, other than a sale and division of the proceeds.

177.    Upon information and belief, the Real Property cannot be subdivided.

178.    The sale of the estate's interest in the Real Property would realize significantly less for the estate than the sale of such property free of the interest of Tera Kodsi.

179.    The benefit to the estate of a sale of the Real Property free of the interest of Tera Kodsi outweighs the detriment, if any, to Tera Kodsi.

180.    The Real Property is not used in the production, transmission or distribution, for sale, of electric energy, or of natural or synthetic gas for heat, light, or power.

WHEREFORE, pursuant to 11 U.S.C. §363(h) and Federal Bankruptcy Rule 7001(3), the Trustee seeks judgment in his favor and against the Debtor and Tera Kodsi providing that the Trustee may sell the Real Property free and clear of the interests of Tera Kodsi, subject to proper notice and a hearing in the main case pursuant to Rule 6004.

<u>COUNT X</u>
**ACTION TO IMPOSE AN EQUITABLE LIEN AGAINST THE REAL PROPERTY**
**(Against Debtor and Tera Kodsi)**

181.    The Trustee realleges and reincorporates the allegations in paragraphs 1 - 71 above as if fully set forth herein.

182.    This is an action to impose an equitable lien over the Real Property.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

183.     The Homestead Transfers and transfer of the Improvements Funds via the Draw Funds into the Real Property were made with the intent to hinder, delay or defraud the Debtor's unsecured creditors.

184.     The Homestead Transfers were done to transfer non-exempt property to exempt property in order to keep such monies out of the reach of the Debtor's creditors.

185.     In addition, the transfer of the Improvements Funds via the Draw Funds into the Real Property was done to increase the equity in the Real Property which the Debtor could claim exempt as homestead of TBE, and which equity would be out of the reach of his creditors.

186.     Tera Kodsi was unjustly enriched by the Debtor's fraud and should not stand to gain from the Debtor's actions.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment as follows: (i) imposing an equitable lien in the name of and for the benefit of the Trustee against the Real Property, which lien shall be determined to be superior to the remaining interests, if any, of Tera Kodsi; (ii) foreclosing the estate's equitable lien in the Real Property and providing that the Trustee may sell the Real Property through a public auction; and (iii) granting such other and further relief as is just and appropriate.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 30, 2014, the foregoing document was served via the Court's Notice of Electronic Filing upon the Registered Users listed on the attached **<u>Exhibit 1</u>**.

s/ Daniel N. Gonzalez
Daniel N. Gonzalez, Esquire
Fla. Bar No: 0592749
Dgonzalez@melandrussin.com
Lawrence E. Pecan, Esquire
Fla. Bar No: 99086
LPecan@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221
*Attorneys for Trustee*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363



**ARK FINANCIAL GROUP**

701 W. Cypress Creek Rd.
Third Floor
Ft. Lauderdale, Fl. 33309
Tel 954.771.6777
Fax 954.771.6888
www.ark-financial.com

Dear Investors,

Enclosed please find a partial payment for September 1, 2008.

Due to the significant external factors the environment has created a number of challenges for the company. Ark Financial has not been spared from the economic downturn currently affecting the United States and in particular our industry.

As a matter of prudence no interest payments will be paid effective October 1, 2008, until sufficient progress has been made. I am actively working through the issues at the current time to reach resolutions. As the company restructures its finances and gets itself back on better footing, then it can permit itself to resume payments.

I look forward to discussing with you the current situation in detail. Please call me at your earliest convenience.

Sincerely yours,

Isaac Kodsi

EXHIBIT A

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

JASON BRADY,
    Plaintiff,

CASE NO.:

**1 1 - 2 1 6 2 6**

vs.

COMPLAINT AND
JURY TRIAL DEMAND

K.I.T. FINANCIAL SERVICES, INC.,
d/b/a ARK FINANCIAL GROUP, a
Florida Corporation, and ISAAC KODSI,
    Defendants.    /

A TRUE COPY

SEP 1 3 2011

HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

PLAINTIFF sues the Defendants K.I.T. FINANCIAL SERVICES, INC., d/b/a ARK FINANCIAL GROUP, (herein after referred to as K.I.T), and Defendant ISAAC KODSI (herein after referred to as KODSI)) and states:

1.     This is an action for damages in excess of $15,000.00.

2.     Plaintiff is a resident of Broward County, Florida.

3.     Defendant K.I.T. does business in Broward County, Florida and Defendant KODSI resides or does business in Broward County, Florida..

4.     Plaintiff hired the undersigned attorney and agreed to pay him a reasonable fee.

COUNT I.

5.     Plaintiff restates and realleges allegations 1 through 4.

6.     This is an action on a Promissory Note.

7.     On November 1, 2001, Defendant K.I.T. executed and delivered a Promissory Note in the amount of $100,000.00 to Plaintiff and his mother in Broward County, Florida. Attached hereto and made a part hereof as Plaintiff Exhibit "A" is a copy of said Note.

8.     Plaintiff now owns and holds the entire Note. See Exhibit "B" attached hereto.

EXHIBIT B

9.  Defendant K.I.T. failed to pay any interest since October 1, 2008.

10.  Defendant K.I.T. also failed to pay the principle of the Note when due on October 1, 2010.

11.  Defendant K.I.T. owes Plaintiff $100,000.00 that is due with interest since October 1, 2008 at 18% interest.

WHEREFORE, Plaintiff demands judgment against K.I.T. in the amount of $100,000.00, plus interest, court costs, attorney's fees, and such other relief as the Court deems just and proper.

<u>COUNT II.</u>

12.  Plaintiff restates and realleges allegations 1 through 4.

13.  This is an action to re-establish a Promissory Note under Florida Statute 673.3091.

14.  Plaintiff is not in possession of the original Promissory Note and Plaintiff cannot reasonably obtain possession of the Note because it is lost or destroyed.

15.  Plaintiff had the right to enforce the subject Note when it was lost or destroyed, or Plaintiff has acquired the right to enforce the subject Note from the party who had the right to enforce it when it was lost or destroyed.

16.  The loss of possession of the subject Note was not the result of a lawful transfer or due to lawful seizure.

17.  Plaintiff cannot obtain possession of the Note because the Note was destroyed, its whereabouts cannot be determined or is in the possession of an unknown person that cannot be found.

18.  Plaintiff will prove the terms and conditions of the subject Note for which an accurate copy is attached hereto as Exhibit "A".

19.  Plaintiff will indemnify third parties against future unlawful enforcement of the subject Note.

WHEREFORE, Plaintiff respectfully requests that this honorable Court enter judgment re-establishing said lost Note and grant such other relief as is just and proper.

### COUNT III.

20. This is an action for securities fraud.

21. Plaintiff restates and realleges allegations 1 through 3.

22. The Promissory Note attached to the Complaint as Exhibit "A" is a security since the money was invested with KODSI and K.I.T. to make money through the efforts of KODSI and K.I.T. for Plaintiff.

23. It is believed that the money may have been used by KODSI and K.I.T. to purchase real estate which was distressed and the moneys earned from the eventual sale of the real estate was to pay a return to the owners of the subject Note.

24. KODSI is an attorney and in a position of trust and used such position to dupe his clients and investors into a sense of safety. He never disclosed the risky nature of the investments he made for his clients.

25. In fact, the entire scheme was a ponzi scheme wherein KODSI collected money from various investors and used the infusion of new investors' money or rents from distressed properties to pay the interest returns to the old investors.

26. At a meeting in November of 2009, KODSI advised Plaintiff that the investments were not doing well but that Plaintiff should still feel comfortable about the investment of the $100,000.00.

27. The Plaintiff learned of this ponzi scheme in a meeting which took place in November of 2010, wherein KODSI admitted to the Plaintiff that he owed the amount due but needed more time to make payment.

28. At said meeting of November of 2010, KODSI invited the Plaintiff to seek new investors who would invest money with KODSI. These moneys would then provide

KODSI the ability to make payment to Plaintiff. KODSI further advised Plaintiff that besides a return on his investment he would also make Plaintiff an equity investor to earn moneys above his $100,000.00.

29.    As a result of the above investment and ponzi scheme, the Plaintiff has been damaged.

WHEREFORE, the Plaintiff seeks $100,000.00 damages against KODSI and K.I.T. together with interest and court costs, and that the Court grant such other relief as is just and proper.

<u>COUNT IV.</u>

30.    Plaintiff restates and realleges allegations 1 through 3.

31.    This is an action for an accounting.

32.    Defendant KODSI ran a ponzi scheme in which money which was invested by the Plaintiff and others were paid interest from the subsequent infusion of capital and investments made by other investors.

33.    That eventually the ponzi scheme collapsed and the Plaintiff lost all of his principle investment.

34.    Defendant KODSI acted in a position of trust with the investors and repeatedly assured Plaintiff that his investment was safe when in fact he knew that the investment was lost.

35.    In order to unravel this ponzi scheme, it is necessary that an accounting be made of all moneys paid into the scheme and all moneys paid out of the scheme by K.I.T. and KODSI since its inception.

36.    All the books and records are in the possession of the Defendants and Plaintiff is unable to discover what happened to his investment without a complete accounting.

37.    Plaintiff demands trail by jury of all issues.

WHEREFORE, the Plaintiff requests an accounting be made by the Defendants K.I.T. and
KODSI from the inception of their investment scheme and that the Court grant such other relief as
is just and proper.

KENNETH S. SANDLER, ESQUIRE
KENNETH S. SANDLER, P.A.
Attorney for Plaintiff
2924 Davie Road - Suite 102
Davie, Florida 33314
Telephone    954-640-9438
Fax          954 640-9160
Florida Bar No. 221015

Lit\Brady\Complaint.KIT.Brady

# PROMISSORY NOTE

**$100,000.00**                                                    Fort Lauderdale
                                                                   NOVEMBER 1, 2001

    FOR VALUE RECEIVED, **K.I.T. FINANCIAL SERVICES, INC. d/b/a ARK FINANCIAL GROUP**, a Florida corporation, hereby promises to pay to the order of Laurie **Brady**, a single woman and son **Jason Brady**, at 16391 Stonehaven Road, Miami Lakes, Fl 33014 or any other place as the holder may from time to time designate in writing, in lawful money of the United States of America, the principal sum of **One Hundred Thousand and 00/100 Dollars ($100,000.00)**, together with interest thereon at the rate of Ten percent (10%) per annum. Said Ten percent (10%) interest shall be paid in Monthly installments, each installment totaling **Eight Hundred Thirty Three and 33/100 ($833.33) Dollars**. Each monthly installment shall become due and payable on the first day of each month commencing **DECEMBER 1, 2001**.

    The entire indebtedness evidenced by this Note, both principal and interest, shall be due and payable on **OCTOBER 1, 2010**.

    All or part of the principal indebtedness may be prepaid with interest to the date of payment at any time or times without penalty.

    If any installment of principal or interest, or both, shall not be paid by the 10th of any month, maker will pay a late charge to Holder. The amount of the charge will be Ten percent (10%) of the overdue payment of principal or interest. During this period the Note shall be considered in default. While in default and after maturity (whether normal maturity or accelerated maturity resulting from default), all indebtedness remaining unpaid, both principal and interest, shall bear interest at the highest lawful annual rate from the due date of the past due, unpaid installment until the date of payment. If any installment of principal or interest, or both, shall not be paid on the due date, the entire indebtedness remaining unpaid, both principal and interest, shall, at the option of the holder, be and become immediately due and payable.

    The maker, who is or may hereafter become liable for the payment hereof:

    (1) agrees to pay all costs and expenses of collection, including reasonable attorney fees if this Note shall be placed in the hands of an attorney for collection, whether suit shall be brought or



not, and if suit shall be brought, to pay reasonable attorney fees and costs and expenses of collection incurred in trial and appellate proceedings and in supplementary proceedings for collection of judgment;

(2) agrees to waive presentment for payment, demand, notice of demand, protest, presentment for payment, notice of maturity, non-payment or protest, all requirements necessary to hold them liable, and all delays in collection and

(3) expressly consent and agrees to all extensions of time, renewals, waivers, releases, or modifications that may be granted by Holder with respect to the payment hereunder, whether granted before, at or after maturity.

Notwithstanding anything contained herein to the contrary, the holder(s) of this Note will never be entitled to receive, collect or apply as interest on the indebtedness evidenced hereby any amount in excess of the highest lawful annual rate of interest, and if any holder hereof ever receives, collects, or applies as interest any such excess, the amount in excess of the highest lawful rate of interest shall be applied to reduce the principal indebtedness; and if the principal indebtedness has been paid in full, and remaining excess shall forthwith be paid to the Maker(s) under this Note.

This instrument shall be governed by and construed according to the laws of the State of Florida.

K.I.T. Financial Services, Inc.
d/b/a Ark Financial Group

Isaac Kodsi, President

IN THE CIRCUIT COURT FOR MIAMI- DADE COUNTY, FLORIDA

IN RE: ESTATE OF

PROBATE DIVISION

LAURIE JUNE BRADY
Deceased.

File Number

Division

**11- 2 7 1 9 CP 0 1**

## ORDER OF SUMMARY ADMINISTRATION
(intestate)

**FORD**

On the petition of **JASON E. BRADY** for Summary Administration on the estate of **LAURIE JUNE BRADY**, deceased, the court finding that the decedent died on the 27th day of **January, 2005**; that the material allegations of the petition are true; and that the decedent's estate qualifies for summary administration and an Order of Summary Administration should be entered, it is

ADJUDGED that there be immediate distribution of the assets of the decedent as follows:

| Name and Address | Relationship | Share or Interest |
|---|---|---|
| JASON E. BRADY<br>2900 S.W. 57th Court<br>Dania Beach, Fl. 33312 | SON | All of the 50% interest in<br>that certain promissory note<br>In the amount of $100,000.00<br>Dated 11/1/2001 owed by<br>K.I.T. Financial Services, Inc.<br>to decedent |

ADJUDGED FURTHER, that those to whom specified parts of the decedent's estate are assigned by this order shall be entitled to receive and collect the same, and to maintain actions to enforce the right;

ADJUDGED FURTHER, that debtors of the decedent, those holding property of the decedent, and those with whom securities or other property of decedent are registered, are authorized and empowered to comply with this order by paying, delivering, or transferring to those specified above the parts of the decedent's estate assigned to them by this order, and the persons so paying, delivering, or transferring shall not be accountable to anyone else for the property.

ORDERED this ___ day of _____, 2011.

_____
Circuit Judge

LAWRENCE A. SCHWARTZ

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

JOHN D. CAVO REVOCABLE TRUST,

       Plaintiff,

v.

ISAAC KODSI, an individual and KODSI LAW
FIRM P.A., a Florida Corporation,

       Defendants.

_____/

CASE NO.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, John D. Cavo Revocable Trust U/A/D/ 12/22/97 (hereinafter "Cavo") sues

Defendants, Isaac Kodsi (hereinafter "I. Kodsi") and Kodsi Law Firm P.A. (hereinafter "Kodsi

Lawfirm") and states:

1.     This Court has jurisdiction over the causes of action alleged herein as Plaintiff's

damages exceed $15,000.00, exclusive of costs, pre-judgment interest and attorney's fees.

2.     Venue is proper in this Court pursuant to §§47.011, 47.041, 47.051, Florida

Statutes (2008), because (a) the causes of action accrued in Broward County, Florida; (b)

Defendants reside and/or transacted business related to this action in Broward County, Florida;

and (c) the Defendants' tortuous conduct occurred in Broward County, Florida.

## FACTUAL BACKGROUND

3.     Defendant, Isaac Kodsi is an individual, who at all material times was an officer

or director of Kodsi Lawfirm, and manager and/or member of Ark Development/Oakland Park

LLC and Team Equity/Oakland Park LLC, each with offices in Broward County, Florida.

EXHIBIT C

4.    Plaintiff first met I. Kodsi in 2005 by means of an introduction provided by Pete Tocci, an employee or business associate of I. Kodsi.   Plaintiff was introduced to I. Kodsi as a member of Kodsi Lawfirm and an individual with expertise in the business and legal aspects of real estate development. I. Kodsi represented to Cavo that he would be developing a condominium project known as the "Oakland Park Project" and offered Cavo the opportunity to purchase a unit at pre-construction price of  $500,000.00 which I. Kodsi represented was  a substantial discount from the projected value of finished units.

5.    I. Kodsi knew that Plaintiff trusted and respected him as an attorney.  Defendant I. Kodsi took advantage of the relationship of trust and solicited Plaintiff's involvement in securities investments I. Kodsi was organizing under the guise of offering to sell a condominium unit at discounted pre-construction pricing.

6.    The offer to sell a condominium unit from the Kodsi Lawfirm offices was done with the knowledge and authority of Kodsi Lawfirm.

7.    Based on I. Kodsi's presentation of a sales pitch to Plaintiff in face-to-face meetings, which took place at I. Kodsi's offices at Kodsi Lawfirm, through letters, e-mails under I. Kodsi's e-mail address, and through telephone communications from Kodsi Lawfirm offices, Plaintiff agreed to purchase a condominium unit in the Oakland Park Project.

8.    I. Kodsi instructed Plaintiff to provide his funds to be invested by deposit into the Kodsi Lawfirm trust account.

9.    On May 10, 2005, Plaintiff delivered its check to Kodsi Lawfirm trust account in the amount of $500,000.00.  A true and correct copy of the check is attached as Exhibit "A".

10.    Several months passed during which Plaintiff received no information or documentation from I. Kodsi or Kodsi Lawfirm regarding the purchase and sale of the

2

condominium unit. In response to Plaintiff's inquiries, during the fall of 2005, I. Kodsi first informed Plaintiff that I. Kodsi was not yet authorized to sell the condominium unit but had included Plaintiff in a group of investors who would participate in the development of the Oakland Park Project. Upon information and belief, I. Kodsi and Kodsi Lawfirm had already transferred Plaintiff's funds, without authorization, to an entity known as Team Equity/Oakland Park LLC.

11.    The offer for sale of securities from the Kodsi Lawfirm offices was done with the knowledge and authority of Kodsi Lawfirm.

12.    I. Kodsi was the seller of the securities as defined by Florida Statute §517 and he performed the sales as an employee, agent, owner or partner of Kodsi Lawfirm. Kodsi Lawfirm promoted and supported the business plan as a business that would generate income for Kodsi Lawfirm.

13.    Plaintiff understood that I. Kodsi was acting with the actual or apparent knowledge and consent of Kodsi Lawfirm.

14.    The address of the investment entity into which I. Kodsi directed Plaintiff's investment, Team Equity/Oakland Park LLC, is the same address as Kodsi Lawfirm: 701 West Cypress Creek Road, Fort Lauderdale FL 33309.

15.    Kodsi Lawfirm participated in the solicitation, sale, investment or accounting for Team Equity/Oakland Park LLC.

16.    I. Kodsi directly solicited the investment funds from Plaintiff and others in a common enterprise, with profits to come solely from the efforts of others and Plaintiff had the expectation of receiving profits on their investments based on I. Kodsi's representations.

3

17.   I. Kodsi represented to Plaintiff that he was soliciting the investment for a pool of investor funds that would be used for an investment in real property and development of a mixed-use condominium development.

18.   I. Kodsi also represented that after raising the capital, he and entities he controlled or managed, including Kodsi Lawfirm, were going to manage, operate and provide services for the Investment Entity.  I. Kodsi and Kodsi Lawfirm actually performed management, operations and services for Team Equity/Oakland Park LLC Investment Entity.

19.   I. Kodsi told the Plaintiff that he was making a real estate investment in Fort Lauderdale, Florida (the "Oakland Park Project").  I. Kodsi further represented that he was only allowing a limited number of investors to participate and that there was no risk to the capital invested.   Specifically, I. Kodsi represented that he was raising five million dollars ($5,000,000.00) which would be used to purchase the property upon which the Oakland Park Project would be developed so that funds provided by investors such as the Plaintiff would always be secured by the value of the property upon which the Oakland Park Project would be developed.

20.   I. Kodsi also represented that after making the investment, Plaintiff would enjoy an equity interest comprising 77.5 of 1,000 membership units in the Team Equity/Oakland Park LLC Investment Entity.

21.   I. Kodsi also represented that he would be managing the investment and that Kodsi Lawfirm would be providing services for the investment entity.  The fact that I. Kodsi a lawyer and Kodsi Lawfirm, a respected law firm, was supervising the investment was an important inducement for the Plaintiff to purchase the securities.

4

22.     When soliciting Plaintiff, I. Kodsi touted the fact that he had invested his personal funds in the investment, and that Plaintiff was receiving the same opportunity as he was, that Kodsi Lawfirm was providing services on behalf of the investors, including Plaintiff. Furthermore, I. Kodsi promoted his personal investment as a selling point that he had a financial interest which strongly aligned with the best interest of the Plaintiff even beyond any fiduciary duty he owed.

23.     I. Kodsi requested that Plaintiff execute a document related to the Team Equity/Oakland Park LLC Investment Entity.  Plaintiff believes the document constituted an LLC operating agreement, however, Plaintiff was not afforded an opportunity to review the document prior to the date when (i) Plaintiff delivered his check payable to the Kodsi Lawfirm trust account to fund the purchase of the condominium unit, (ii) Kodsi Lawfirm released Plaintiff's funds to Team Equity/Oakland Park LLC Investment Entity, or (iii) Plaintiff executed the document. Plaintiff possesses only a copy of a document described as "Schedule A – SCHEDULE OF MEMBERS, CAPITAL CONTRIBUTIONS, AND MEMBERSHIP UNITS" (a true and correct copy of which is attached hereto as Exhibit "B") and a document described as "Investment Option Addendum to Limited Liability Company Operating Agreement of TEAM EQUITY/OAKLAND PARK, LLC" (a true and correct copy of which is attached hereto as Exhibit "C").

24.     Based on I. Kodsi's representations as an attorney and member of the Kodsi Lawfirm, Plaintiff executed investment documents regarding the Team Equity/Oakland Park LLC Investment Entity.

25.     I. Kodsi and Kodsi Lawfirm directed Plaintiff's investment funds into the Team Equity/Oakland Park LLC Investment Entity.

5

26.    At no time did I. Kodsi or Kodsi Lawfirm provide a Private Placement Memorandum, a Solicitation Agreement, or a Subscription Agreement for the Team Equity/Oakland Park LLC Investment Entity or otherwise disclose any investment risks.

27.    I. Kodsi and Kodsi Lawfirm did not disclose any investment risks on or before Plaintiff made the investment.

28.    Over the course of 2006, 2007 and most of 2008, I. Kodsi continued to promote the investments in a positive manner and assured Plaintiff that he was taking the necessary steps for the Plaintiff to receive the promised return of his capital and profits

29.    It was not until October 2008, that I. Kodsi for the first time informed Plaintiff that:

    a.   the investment was doing poorly;

    b.   that the capital Plaintiff had invested was at risk;

    c.   that Plaintiff's funds had not been applied to purchase the real property upon which the Oakland Park Project would be developed;

    d.   that I. Kodsi had not raised the five million dollars I. Kodsi had projected as necessary and sufficient investment capital to purchase the property upon which the Oakland Park Project would be developed without obtaining debt secured by the property;

    e.   that the real property upon which the Oakland Park Project would be developed had been purchased with funds borrowed from third parties and secured by a first mortgage security interest in the property;

f.   that the real property upon which the Oakland Park Project would be developed had been further encumbered by a second mortgage security interest granted to another group of third party investors; and

g.   that the entity that owned the property upon which the Oakland Park Project would be developed was in default of its obligations under the notes secured by the first and second mortgages and threatened with foreclosure;

30.   In November 2009, counsel for I. Kodsi informed the undersigned, as counsel for Plaintiff, that a court had entered Final Judgment of Mortgage Foreclosure against the property upon which the Oakland Park Project was to have been developed.

31.   Upon information and belief, I. Kodsi and/or Kodsi Lawfirm have never held a broker/dealer license in the State of Florida.

32.   At the time Plaintiff made the investment, he was not told the true nature of his ownership interest in the Oakland Park Project via the Team Equity/Oakland Park LLC Investment Entity. I. Kodsi induced Plaintiff to invest in Team Equity/Oakland Park LLC Investment Entity under the guise of false representations and omissions of material fact regarding the risk to Plaintiff's capital contributions and the fact that there was more than one entity created for the investment, that the entities were highly leveraged and the financial structure of the investment vehicles put at risk the capital invested in addition to the promised income.

33.   Plaintiff has never received a Membership Certificate for the Team Equity/Oakland Park LLC Investment Entity.

34.   At no time was Plaintiff provided a copy for review and analysis of a Private Placement Memorandum, Solicitation Agreement or Subscription Agreement for the Team

Equity/Oakland Park LLC Investment Entity if such documents existed.    If I. Kodsi had made the required full and fair disclosure, Plaintiff would not have made the investments.

35.    I. Kodsi failed to disclose any risks of the Investments.  For example, I. Kodsi failed to disclose:

    a.    That funds invested in the Team Equity/Oakland Park LLC Investment Entity would not be applied to purchase the real property;

    b.    The impact of risk from:

        i.    Team Equity/Oakland Park LLC Investment Entity not having ownership interest in the real property;

        ii.    Ark Development/Oakland Park LLC, mortgaging or leveraging the property;

        iii.    Changes in interest rates;

        iv.    Changes in tax laws;

        v.    Increases in development and construction costs;

        vi.    The location of the property;

        vii.    The potential for adverse changes in the general economic conditions; increases in operating costs;

        viii.    The potential for changes in zoning laws or governmental regulations;

    c.    The financial structure of the Investment Entity;

    d.    The structure of the financing and mortgage debt;

    e.    Any conflict of interest;

    f.    Payment of any commissions for the sale of the securities;

    g.    Plaintiff's right to rescission.

36.     Prior to Plaintiff depositing funds, I. Kodsi never disclosed to Plaintiff that he was receiving compensation or commissions for soliciting the investments or the nature and extent of I. Kodsi's compensation for managing the entities.

37.     Plaintiff did not receive the represented return of any capital on his investment in the Oakland Park Project as a member of the Team Equity/Oakland Park LLC Investment Entity or otherwise.

38.     Kodsi Lawfirm provided services to the Team Equity/Oakland Park LLC Investment Entity and other entities involved in the planned development of the property upon which the Oakland Park Project was to have been developed.

39.     At all material times, I. Kodsi acted in the course and scope of his employment with Kodsi Lawfirm and with Kodsi Lawfirm's knowledge and consent.  In addition, I. Kodsi acted as an agent and/or apparent agent of Kodsi Lawfirm with respect to I. Kodsi's actions described herein, including I. Kodsi's solicitation of Plaintiff.  Kodsi Lawfirm also ratified I. Kodsi's conduct by providing the services for the investments for which Kodsi Lawfirm received compensation.

## COUNT I
## NEGLIGENT MISREPRESENTATION-RESCISSION

40.     Plaintiff realleges paragraph 1- 40 above as if fully forth herein.

41.     This is an action for negligent misrepresentation against I. Kodsi and Kodsi Lawfirm seeking rescission of Plaintiff's purchase of securities that are currently owned by Plaintiff.

42.     I. Kodsi made false representations to Plaintiff, including but not limited to, that:

    a.    Plaintiff was being afforded the opportunity to purchase a condominium unit at a substantially discounted preconstruction pricing;

    b.    Plaintiff's investment capital was not at risk;

    c.    After making the investments, Plaintiff would receive return of his initial capital plus promised profit on the investment;

    d.    Kodsi Lawfirm would be providing services and looking out for Plaintiff's interest; and

    e.    I. Kodsi had invested his personal funds in the same investment as Plaintiff.

43.    The false representations and omission were material to Plaintiff's investments decision.

44.    I. Kodsi knew or should have known, in the exercise of reasonable care, that the misrepresentations and omissions were false or materially misleading.

45.    I. Kodsi knew or should have known that he had a duty to disclose accurate and complete information.

46.    I. Kodsi negligently caused the omission of accurate and complete information regarding the risk to Plaintiff's capital.

47.    I. Kodsi intended that Plaintiff rely on the representations and omissions.

48.    Plaintiff justifiably relied on the representations or omissions.

49.    Plaintiff demands rescission of his respective securities and investment interests.

50.    Plaintiff hereby tenders to I. Kodsi and Kodsi Lawfirm his interest in the Team Equity/Oakland Park LLC for which the Plaintiff never received a Membership Certificate.

51.    Plaintiff is entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate, less the amount of any income received by Plaintiff.

52.    I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

      a.    I. Kodsi was a Kodsi Lawfirm employee or agent;

      b.    I. Kodsi was held out as a Partner of Kodsi Lawfirm;

      c.    I. Kodsi was a shareholder of Kodsi Lawfirm;

      d.    I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

      e.    Kodsi Lawfirm participated in the sale of securities;

      f.    Kodsi Lawfirm aided in making the sale of securities;

      g.    I. Kodsi and/or Kodsi Lawfirm were the seller(s) of the securities.

53.    Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment for rescission, jointly and severally against I. Kodsi and Kodsi Lawfirm, including interest, costs, and such other relief as this court deems just and proper.

## COUNT II
## NEGLIGENT MISREPRESENTATION – DAMAGES

54.    Plaintiff realleges paragraph 1- 40 above as if fully set forth herein.

55.    This is an action for negligent misrepresentation against I. Kodsi and Kodsi Lawfirm seeking damages.

56.    The false representations and omissions were material to Plaintiff's investment decision.

11

57.    I. Kodsi knew or should have known that he had a duty to disclose accurate and complete information.

58.    I. Kodsi negligently caused the omission of accurate and complete information regarding the risk to Plaintiff's capital.

59.    I. Kodsi intended that Plaintiff rely on the representations and omissions.

60.    Plaintiff justifiably relied on the representations or omissions.

61.    Plaintiff is entitled to recover the consideration paid for the securities plus interest thereon at the legal rate, less the amount of any income received by each of Plaintiff.

62.    I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

     a.    I. Kodsi was Kodsi Lawfirm's employee or agent;

     b.    I. Kodsi was held out as a Partner of Kodsi Lawfirm;

     c.    I. Kodsi was a shareholder of Kodsi Lawfirm;

     d.    I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

     e.    Kodsi Lawfirm participated in the sale of securities;

     f.    Kodsi Lawfirm aided in making the sale of securities;

     g.    I. Kodsi and/or Kodsi Lawfirm were the seller of the securities.

WHEREFORE, Plaintiff demands judgment for damages, jointly and severally, against I. Kodsi and Kodsi Lawfirm, plus interest, costs, and such other relied as deemed just and proper.

## COUNT III
## FLORIDA SECURITES REGISTRATION VIOLATION – RESCISSION

63.    Plaintiff realleges paragraph 1- 40 above as if fully set forth herein.

64.     This is an action against I. Kodsi and Kodsi Lawfirm seeking rescission pursuant to §517.211(1), Fla. Stat. for violations of §517.07. Fla. Stat., for failure to register the securities sold to Plaintiff.

65.     The securities sold to Plaintiff are securities under Florida Law, and the transactions through which the sales occurred were not exempt transactions because of the failure to meet the requirements of §517.061(11), Fla. Stat. with regard to such sales.

66.     Defendants intended to sell the securities without registering them with the Florida Office of Financial Regulation, by claiming that the securities would be sold through exempt transactions.

67.     However, Defendants failed to satisfy all statutory requirements for the sale of an exempt security under Florida law, thereby giving Plaintiff the right to demand rescission of the purchase of shares/membership interests currently owned by Plaintiff.

68.     The following violations of §517.061(11) Fla. Stat. occurred, each of which when proven shall independently support the remedy of rescission pursuant to:

      a.     Failure to provide, or to give reasonable access to, full and fair disclosure of all material information underlying the investments in accordance with §517.061(11)(a)3., Fla. Stat., in that I. Kodsi failed to provide the Plaintiff with a Private Placement Memorandum, Solicitation Agreement or Subscription Agreement for any of the investments and also failed to disclose the conflict of interest arising out of the payment of commissions to I. Kodsi for procuring the funds he solicited from the investors, including the Plaintiff, as well as, the nature and amount of additional monies I. Kodsi was paid on the investments;

13

b.    Failure to disclose the payment of commissions or compensation, for the sale of the shares, to I. Kodsi who was not at the time a registered security dealer pursuant to §517.061(11)(a)4., Fla. Stat.;

c.    Failure to provide the Plaintiff with notice of a three day right of rescission, as there were sales made to more than five persons in Florida pursuant to §517.061(11)(a)5., Fla. Stat.

69.    Pursuant to §517.211(1), Fla. Stat., Plaintiff demands rescission of his purchase of the securities and hereby tenders to I. Kodsi and Kodsi Lawfirm his interest in the Team Equity/Oakland Park LLC for which the Plaintiff never received a Membership Certificate

70.    Plaintiff is entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate, less the amount of any income received by Plaintiff.

71.    I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

a.    I. Kodsi was Kodsi Lawfirm's employee agent;

b.    I. Kodsi was held out as a Partners of Kodsi Lawfirm;

c.    I. Kodsi was a shareholder of Kodsi Lawfirm;

d.    I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

e.    Kodsi Lawfirm participated in the sale of securities;

f.    Kodsi Lawfirm aided in making the sale of securities;

g.    I. Kodsi and/or Kodsi Lawfirm were the seller of the securities.

72.    Pursuant to §517.211(6), Fla. Stat., Vezina, Lawrence & Piscitelli, P.A. is entitled to recover attorneys fees for successful prosecution of this claim.

14

WHEREFORE, Plaintiff demands judgment for rescission against I. Kodsi and Kodsi Lawfirm, jointly and severally, including interest, costs, and attorney's fees, and such other relief as deemed just and proper.

## COUNT IV
## FLORIDA SECURITIES FRAUD – RESCISSION

73. Plaintiff realleges paragraph 1- 40 above as if fully set forth herein.

74. This is an action for violations of §517.301, Fla. Stat. pursuant to §517.211(2), Fla. Stat.

75. The shares constitute a security under Florida law.

76. The false representations and omissions were material to Plaintiff's investment decision.

77. I. Kodsi knew or should have known, in the exercise of reasonable care, that his misrepresentations and omissions were false or materially misleading.

78. I. Kodsi knew or should have known that he had a duty to disclose accurate information.

79. I. Kodsi caused the omission of accurate and complete information regarding the risk to Plaintiff's capital.

80. I. Kodsi intended that Plaintiff rely on the representations and omissions.

81. Plaintiff justifiably relied on the representations or omissions.

82. Based on the foregoing allegations in this Count, I. Kodsi directly or indirectly, employed a device scheme, and artifice to defraud Plaintiff in connection with the offer and sale of the shares, which are securities under Florida law, in violation of §517.301(1)(a)1., Fla. Stat.

15

83.    I. Kodsi actions violated §517.301(1)(a)2., Fla. Stat. because he used untrue statements of material fact and omitted material facts necessary in order to make the statements actually made, in light of the circumstances under which they were made, not misleading.

84.    I. Kodsi action also violated §517.301(1)(a)3., Fla. Stat. because those actions caused Plaintiff to engage in transactions, practices, or course of business which operated as a fraud or deceit on Plaintiff.

85.    Plaintiff hereby tenders to I. Kodsi and Kodsi Lawfirm as a condition precedent to demanding rescission of the transactions pursuant to §517.211(2), Fla. Stat. his membership interest in the Team Equity/Oakland Park LLC for which the Plaintiff never received a Membership Certificate.

86.    Plaintiff is entitled to recover the consideration paid for the securities and LLC interest, plus interest thereon at the legal rate, less the amount of any income received by Plaintiff.

87.    I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

    a.    I. Kodsi was Kodsi Lawfirm's employee agent;

    b.    I. Kodsi was held out as a Partner of Kodsi Lawfirm;

    c.    I. Kodsi was a shareholder of Kodsi Lawfirm;

    d.    I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

    e.    Kodsi Lawfirm participated in the sale of securities;

    f.    Kodsi Lawfirm aided in making the sale of securities;

    g.    I. Kodsi and/or Kodsi Lawfirm were the seller of the securities.

16

89.     Pursuant to 517.211(6), Fla. Stat., Vezina, Lawrence & Piscitelli, P.A. is entitled to recover attorney's fees for successful prosecution of this claim.

WHEREFORE, Plaintiff demands judgment for rescission, jointly and severally, against I. Kodsi and Kodsi Lawfirm, including interest, costs and attorney's fees, and such other relief as deemed just and proper.

## COUNT V
## FLORIDA SECURITIES FRAUD-DAMAGES

90.     Plaintiff realleges paragraph 1- 40 above as if fully set forth herein.

91.     This is an action for violations of 517.301 Fla. Stat. pursuant to 517.211(2), Fla. Stat.

92.     The false representations and omissions were material to Plaintiff's investment decision.

93.     I. Kodsi knew or should have known, in the exercise of reasonable care, that the misrepresentations and omissions were false or materially misleading.

94.     I. Kodsi knew or should have known that he had a duty to disclose accurate and complete information.

95.     I. Kodsi caused the omission of accurate and complete information.

96.     I. Kodsi intended that Plaintiff rely on the representations and omissions.

97.     Plaintiff justifiably relied on the representations or omissions.

98.     Based on the foregoing allegations in this Count, I. Kodsi, directly or indirectly, employed a device scheme, and artifice to defraud Plaintiff in connection with the offer and sale of the shares, which are securities under Florida law, in violation of 517.301.(1)(a)., Fla. Stat.

17

99.    I. Kodsi's actions violated 517.301(1)(a)2., Fla. Stat. because they used untrue statements of material fact and omitted material facts necessary in order to make the statements actually made, in light of the circumstances under which they were made, not misleading.

100.    I. Kodsi's actions violated 517.301(1)(a)3., Fla. Stat. because those actions caused I. Kodsi to engage in transactions, practices, or course of business which operated as a fraud or deceit on Plaintiff.

101.    Based on the foregoing allegations in this Count, I. Kodsi directly or indirectly employed a device scheme, and artifice to defraud Plaintiff in connection with the office and sale of the shares, which are securities under Florida law, in violation of 517.301(1)(a)., Fla. Stat.

102.    I. Kodsi's actions violated 517.301(1)(a)2., Fla. Stat. because they used untrue statements of material fact and omitted material facts necessary in order to make the statements actually made, in lights of the circumstances under which they were made, not misleading.

103.    I. Kodsi's actions also violated 517.301(1)(a)3., Fla. Stat. because I. Kodsi engaged in transactions, practices or course of business which operated as a fraud or deceit on Plaintiff.

104.    Plaintiff is entitled to recover the consideration paid for the securities plus interest thereon at the legal rate, less the amount of any income received by Plaintiff.

105.    I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

a.    I. Kodsi was Kodsi Lawfirm's employee agent;

b.    I. Kodsi was held out as a Partner of Kodsi Lawfirm;

c.    I. Kodsi was a shareholder of Kodsi Lawfirm;

    d.     I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

    e.     Kodsi Lawfirm participated in the sale of securities;

    f.     Kodsi Lawfirm aided in making the sale of securities;

    g.     I. Kodsi and/or Kodsi Lawfirm were the seller of the securities.

106.    Pursuant to 517.211(6), Fla. Stat. Vezina, Lawrence & Piscitelli, P.A. is entitled to recover attorney's fees for successful prosecution of this claim.

WHEREFORE, Plaintiff demands a judgment for damages, jointly and severally, against I. Kodsi and Kodsi Lawfirm, including interest, costs, and attorney's fees, and such other relief as deemed just and proper.

## COUNT VI
## FRAUDULENT INDUCEMENT SEEKING RESCISSION

107.    Plaintiff realleges paragraph 1- 40 above as if fully set forth herein.

108.    This is an action for fraud in the inducement against I. Kodsi and Kodsi Lawfirm seeking rescission of the purchase of securities and the LLC membership interest that is currently owned by Plaintiff.

109.    The false representations and omissions were material to Plaintiff's investment decision.

110.    I. Kodsi knew or should have known that he had a duty to disclose accurate and complete information.

111.    I. Kodsi intentionally caused the omission of accurate and complete information.

112.    I. Kodsi intended that Plaintiff rely on the representations or omissions.

113.    Plaintiff justifiably relied on the representations or omissions.

114.     Plaintiff hereby tenders to I. Kodsi and Kodsi Lawfirm as a condition precedent to demanding rescission of the transactions pursuant to §517.211(2), Fla. Stat., his membership interest in the Team Equity/Oakland Park LLC for which the Plaintiff never received a Membership Certificate.

115.     Plaintiff is entitled to recover the consideration paid for the securities and LLC interest, plus interest thereon at the legal rate, less the amount of any income received by Plaintiff.

116.     I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

    a.    I. Kodsi was Kodsi Lawfirm's employee agent;

    b.    I. Kodsi was held out as a Partner of Kodsi Lawfirm;

    c.    I. Kodsi was a shareholder of Kodsi Lawfirm;

    d.    I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

    e.    Kodsi Lawfirm participated in the sale of securities;

    f.    Kodsi Lawfirm aided in making the sale of securities;

    g.    I. Kodsi and/or Kodsi Lawfirm were the seller of the securities.

WHEREFORE, Plaintiff demands judgment for rescission, jointly and severally, against I. Kodsi and Kodsi Lawfirm, including interest, costs, and such other relief as deemed just and proper.

## COUNT VII
## FRAUDULENT INDUCEMENT SEEKING DAMAGES

117.     Plaintiff realleges paragraph 1- 40 above as if fully set forth herein.

20

118.     This is an action for fraud in the inducement against I. Kodsi and the Kodsi Lawfirm.

119.     The false representations and omissions were material to Plaintiff's investment decisions.

120.     I. Kodsi knew or should have known that he had a duty to disclose accurate and complete information.

121.     I. Kodsi intentionally caused the omission of accurate and complete information.

122.     I. Kodsi intended that Plaintiff rely on the representations or omissions.

123.     Plaintiff justifiably relied on the representations or omissions.

124.     Plaintiff is entitled to recover the consideration paid for the securities and Partnership interest, plus interest thereon at the legal rate, less the amount of any income received by Plaintiff.

125.     I. Kodsi and Kodsi Lawfirm are liable, jointly and severally, to Plaintiff either directly or indirectly, for the acts alleged in this complaint as:

    a.     I. Kodsi was Kodsi Lawfirm's employee agent;

    b.     I. Kodsi was held out as a Partner of Kodsi Lawfirm;

    c.     I. Kodsi was a shareholder of Kodsi Lawfirm;

    d.     I. Kodsi and/or Kodsi Lawfirm managed or operated the Investment Entity created for the investments;

    e.     Kodsi Lawfirm participated in the sale of securities;

    f.     Kodsi Lawfirm aided in making the sale of securities;

    g.     I. Kodsi and/or Kodsi Lawfirm were the seller of the securities;

## COUNT VIII
## BREACH OF FIDUCIARY DUTY

126.    Cavo incorporates by reference the allegations set forth in paragraphs 1 through 39, *supra,* as if fully set forth herein.

127.    A fiduciary relationship existed between Cavo and I. Kodsi with respect to the investment made by Plaintiff in that I. Kodsi induced Cavo by stating that I. Kodsi, as an attorney would be supervising the investment and that I. Kodsi had invested his personal funds in the investment.

128.    Because of this fiduciary relationship between the parties, I. Kodsi owed certain duties to Cavo, including, but not limited to, a duty of loyalty, a duty of good faith, a duty not to engage in self-dealing, a duty of fairness and honesty, and a duty of full disclosure and fair dealing.

129.    Cavo reposed confidence and trust in I. Kodsi as a result of the position of superiority and influence held by I. Kodsi.

130.    I. Kodsi breached his fiduciary duty to Cavo by:

    a.    Failing to disclose risks associated with the investment;

    b.    Making false representations to Cavo regarding the investment; and

    c.    Withholding pertinent information from Cavo for an unreasonable amount of time.

131.    The conduct of I. Kodsi evidences material breaches of the duties owed to Cavo, which breaches were a proximate cause of damages suffered by Cavo.

132.    Cavo is entitled to recover damages from I. Kodsi for his breach of the fiduciary duty to Cavo.

22

WHEREFORE, Plaintiff demands judgment for rescission, jointly and severally, against I. Kodsi and Kodsi Lawfirm, including interest, costs, and such other relief as deemed just and proper.

### Demand for Jury Trial

CAVO demands trial by jury on all issues so triable.

Respectfully submitted,

VEZINA, LAWRENCE & PISCITELLI, P.A.

*Attorneys for Plaintiff*
121 Alhambra Plaza, Suite 1604
Coral Gables, FL 33134
Telephone: (305) 443-2043
Facsimile:  (305) 443-2048

and

300 SW First Avenue, Suite 150
Fort Lauderdale, FL 33301
Telephone: (954) 728-1270
Facsimile: (954) 728-1271

By: _____ FoR    FBN 0148120

Jeffrey V. Nelson
Florida Bar No. 724734
Michael J. Friedman
Florida Bar No.: 650854

23

JOHN D CAVO REV TRST
JOHN D CAVO OR GAIL CAVO
CO-TTEES U/A/D 12/22/97  954-474-2535
P O BOX 15310
PLANTATION, FL 33318

**CAP**
Asset Management Account

**1260**

63-2/630
BRANCH 00688

Date *May 10, 2005*

Pay to the
Order of  *Kodsi Law Firm - Trust Acct.*  $ 500,000.00

*First Hundred Thousand and 00/100* —— Dollars

Look for. Micro Print signature line, green background with CAP logo, First Union logo on back. If not present, do not cash.

**FIRST UNION**
**First Union National Bank**
firstunion.com
Org. 003  R/T 063000021

*Oakland Park*

For *Shooters (oak, Bank)*          *Gail C Cavo*

⑆063000021⑆ 9983821653⑈    1260  ⑆0050000000⑈

COLONIAL BANK ORLANDO FL
407-240-4404 051685 26
0063133224  000

1138506637

PAY TO THE ORDER OF
UNION BANK OF FLORIDA
WESTON, FL 33326
05/07/03
FOR DEPOSIT ONLY
KODSI LAW FIRM, P.A.
IOTA TRUST ACCOUNT
0000248354

| Account | Date | Amount | Serial Number | Sequence | Status |
|---|---|---|---|---|---|
| 000000009983821653 | 5/16/2005 | $500,000.00 | 000000000001260 | 0000000001138506637 | Posted Items |

Wachovia Bank, N.A. certifies that the above image is a true and exact copy of the original item issued by the named customer, and was produced from original data stored in the archives of Wachovia Bank, N.A. or its predecessors.

**EXHIBIT**

tabbies

"A"

## SCHEDULE A
TEAM EQUITY/OAKLAND PARK, LLC
## SCHEDULE OF MEMBERS, CAPITAL CONTRIBUTIONS,
## AND MEMBERSHIP UNITS

| Member Name | Address | Initial Capital Contribution | Membership Units |
|---|---|---|---|
| TEAM EQUITY ASSET MANAGEMENT, LLC | 701 WEST CYPRESS CREEK ROAD SUITE 301 FT LAUDERDALE, FL 33309 | $10,000.00 | -225- |
| JOHN D CAVO REVOCABLE TRUST U/A/D 12/22/97 JOHN D CAVO or GAIL CAVO, Co-Trustees | P.O. BOX 15310 PLANTATION, FL 33318 | $500,000.00 | -77.5- |
| Remaining Members | | $4,490,000.00 | -697.5- |
| TOTAL | N/A | $5,000,000.00 | -1000- |

Initials: 

EXHIBIT

"B"

INVESTMENT OPTION ADDENDUM
to
Limited Liability Company Operating Agreement
of
TEAM EQUITY/OAKLAND PARK, LLC,
a Florida limited liability company

This Investment Option Addendum to Limited Liability Company Operating Agreement (the "Operating Agreement"") of TEAM EQUITY/OAKLAND PARK, LLC, a Florida limited liability company (the "LLC"), is made and entered into effective the **1st day of October, 2005** (the "Effective Date") by and between the member named in the attached Investment Illustration (the "Member") and Team Equity/Oakland Park, LLC, a Florida limited liability company.

**WHEREAS,** on or about October 1, 2005, the parties entered into the Operating Agreement; and

**WHEREAS,** the attached Investment Illustration fully sets forth the terms and projections associated with the Member's investment in the LLC; and

**WHEREAS,** the Member has signed an acknowledgment on said Investment Illustration evidencing Member's selection of an investment option and its agreement with the terms and conditions contained therein.

**NOW THEREFORE,** in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. The above recitals are true and correct and are incorporated herein.

2. The Member has selected the straight percentage of company option ("Straight Percentage") which provides the Member with a percentage of the company's future profits.

3. The LLC has the exclusive and unilateral right to a one-time extension of the investment term for a period up to and including six (6) months, provided that the LLC notifies the Member in writing prior to the expiration of the investment term.

**IN WITNESS WHEREOF,** the parties hereto have executed this Investment Option Addendum as of the date written above.

**TEAM EQUITY/OAKLAND PARK, LLC,**
**a Florida limited liability company**

By: TEAM EQUITY ASSET MANAGEMENT, LLC,
a Florida limited liability company
**Managing Member**

By: _____
         Managing Member

**MEMBER**
(named on attached
Investment Illustration)

_____
Member

EXHIBIT
" C "



# ARK FINANCIAL GROUP

## INVESTMENT ILLUSTRATION
### Of
## Team Equity/Oakland Park, LLC

### *Prepared for*
### *Mr. John D. Cavo, Trustee*

| | |
|---|---|
| **Project:** | Ark Development/Oakland Park |
| **Investment Amount:** | $500,000 |
| **Investment Term:** | 3 Years |
| **Investment Option:** | Option 1 (Straight Percentage of Company) |
| **Percentage of Company:** | 2.35% |

| Company Profits* | Profit on % of Co*<br>*[Company Profits<br>times Percentage<br>of Company]* | 3 Year R.O.I.*<br>*[Return on Investment:<br>Pre-Tax Profit divided<br>by Investment Amount]* |
|---|---|---|
| $10,000,000 | $235,000 | 47.00% |
| $11,000,000 | $258,500 | 51.70% |
| $12,000,000 | $282,000 | 56.40% |
| $13,000,000 | $305,500 | 61.10% |
| $14,000,000 | $329,000 | 65.80% |
| $15,000,000 | $352,500 | 70.50% |

* Projected Figures

**The undersigned has reviewed, acknowledged and agreed to this investment illustration and the terms & projections contained herein.**

By: _____     Dated:  October 1, 2005
  John D. Cavo, Trustee

11/23/2010 12:25 PM Filed Lee County Clerk of Court

CFN 2010R0813332 OR BK 27509 Pgs 1691 - 1692 (2pgs)
RECORDED 12/03/2010 15:23:29
HARVEY RUVIN, CLERK OF COURT, MIAMI-DADE COUNTY, FLORIDA

IN THE CIRCUIT COURT IN THE
20TH JUDICIAL CIRCUIT, IN AND FOR
LEE COUNTY, FLORIDA

**HILLCREST BANK, a Kansas Bank**          **GENERAL JURISDICTION**

         **Plaintiff,**                 **CASE NO. 10-CA-051299**

   v.

**FLORIDA LAND FINANCIAL CORP., a
Florida corporation, and
ISAAC KODSI, Individually, and
TERA M. KODSI, Individually,**

            **Defendants.**
_____/

## FINAL DEFICIENCY JUDGMENT

**THIS ACTION** was heard before the Court on Plaintiff's Motion for Deficiency

Judgment on November 18, 2010. On the evidence presented,

   **IT IS ORDERED AND ADJUDGED** that:

   1.    The Plaintiff's Motion for Deficiency Judgment is **GRANTED** in favor of

Plaintiff Hillcrest Bank, N.A., and against Defendants, Florida Land Financial Corp., whose

principal address is 701 West Cypress Creek Road, Suite 301, Fort Lauderdale, Florida 33309,

Isaac Kodsi, whose address is 3407 Chase Avenue, Miami Beach, Florida 33140, and Tera M.

Kodsi, whose address is 3407 Chase Avenue, Miami Beach, Florida 33140.

   2.    The amount due and owing to Hillcrest under the Final Judgment from

Defendants, Florida Land Financial Corp. and Isaac Kodsi, jointly and severally, is

$13,503,249.59. Defendant, Tera Kodsi, who is the spouse of Isaac Kodsi, executed an

Agreement and Joinder of Spouse, wherein she joined and consented to Isaac Kodsi's Guaranty

Agreement.

EXHIBIT D

BOOK 27509 PAGE 1692
LAST PAGE

CASE NO. 10-CA-051299

3.    The total fair market value of the Property, as of July 9, 2010, is $2,400,000.00, which is less than the sum owed by Florida Land Financial Corp. and Isaac Kodsi, jointly and severally, to Hillcrest Bank, N.A. After subtracting the fair market value of the Property from the Final Judgment, the total amount due and owing as of the foreclosure sale date of July 9, 2010, is $11,103,249.59, which has accrued interest to this date in the amount of $240,949.40.

4.    Plaintiff, Hillcrest Bank, N.A., whose address is 11111 W. 95th Street, Overland Park, KS 66214, shall have and recover from the Defendants, Florida Land Financial Corp., and Isaac Kodsi, jointly and severally, damages in the amount of $11,344,198.99, plus interest hereafter at the rate of six percent (6%) per annum, for all of which let execution issue.

5.    The Court retains jurisdiction of this action to enter further orders that are proper, including, without limitation, writs of possession and award of attorneys fees.

DONE AND ORDERED in Chambers in Lee County, Florida on this 18th day of NOV, 2010.

_____
HONORABLE LYNN GERALD, JR.
Circuit Court Judge

Conformed copies furnished by U.S. Mail to:

Gary E. Lehman, P.A.
*Counsel for Plaintiff, Hillcrest Bank, N.A.*
Broad and Cassel
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida 33131

Steven R. Amster, Esq.
*Counsel for Defendants Florida Land Financial Corp., Isaac Kodsi, and Tera M. Kodsi*
Kodsi Law Firm, P.A.
701 W Cypress Creek Road, Suite 303
Fort Lauderdale, Florida 33309

I CERTIFY THIS DOCUMENT TO BE A
TRUE & CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE.

DEC 0 1 2010

Charlie Green, Clerk Circuit
Court Lee County, Florida
BY: _____ D.C.

2

## AGREEMENT AND JOINDER OF SPOUSE

The undersigned ("Joining Party"), each being the spouse of Guarantor under the foregoing Guaranty Agreement, in consideration of the Lender entering into the Loan Documents and accepting the foregoing Guaranty Agreement, hereby:

(a)  consents to the foregoing Guaranty Agreement and subordinates any right or claim of right such Joining Party may now or hereafter have by statute, common law, inheritance or otherwise as a surviving spouse, surviving joint tenant, surviving tenant by the entirety or otherwise to all the rights (present or future) of Lender accruing directly or indirectly under said Guaranty Agreement;

(b)  agrees that any real or personal property, money, effects or other tangible or intangible property owned by such Joining Party's spouse, or by such Joining Party and such Joining Party's spouse jointly or as tenants by the entirety or received by such Joining Party from such Joining Party's spouse at any time while the Guaranty Agreement is in effect without payment or transfer of reasonably equivalent value to such Joining Party's spouse shall be deemed to be or to have remained the sole property of such Joining Party's spouse insofar as enforcement by Lender of its rights under the above Guaranty Agreement is concerned;

(c)  joins in the foregoing Guaranty Agreement to the full extent of such Joining Party's right, title and interest in:  (i) any assets now or hereafter held by such Joining Party jointly (or by the entireties) with such Joining Party's spouse; (ii) any existing or future community property of such Joining Party and of such Joining Party's spouse; (iii) any property or assets now or hereafter held in the name of Guarantor; and (iv) any property hereafter transferred by Guarantor, directly or indirectly, to such Joining Party; and

(d)  waives any requirement for notice of acceptance by Lender of this Agreement and Joinder of Spouse, and of Lender's reliance hereon.

Capitalized terms used in this Consent and Joinder of Spouse which are defined in the foregoing Guaranty Agreement are used herein as therein defined.

_____

Name (print):
Spouse of Isaac Kodsi

14

**EXHIBIT E**

**Department of the Treasury**
**Internal Revenue Service**
IRS - Appeals Office
400 West Bay Street, Suite 252
STOP A
Jacksonville, FL 32202


Date:                    AUG 27 2013


ISAAC & TERA MENENDEZ KODSI
701 W CYPRESS CRK RD STE 301
FT LAUDERDALE FL 33309-2045

**Letter Number:** 894(cg)-c

**Person to Contact:**
  Vivian C. Watson
  Employee ID Number: 0228952
  Tel:  904-665-0976
  Fax:  904-665-1835
**Refer Reply to:**
  AP:FE:JAX:VCW
**In Re:**
  Income Tax Liability
**Form Number:**
  1040
**SSN/EIN Number:**
  ▆▆▆▆▆▆▆

**Last Day to File a Petition with the
United States Tax Court:**

                    NOV 25 2013


**CERTIFIED MAIL**


### Notice of Deficiency

| Tax Year(s) Ended | Tax | Penalties or Additions to Tax IRC 6662 |
|---|---|---|
| December 31, 2006 | $812,875.00 | $162,575.00 |


Dear Mr. & Mrs. Kodsi:

We have determined that you owe additional tax or other amounts, or both, for the tax year(s) identified above.  This letter is your NOTICE OF DEFICIENCY as required by law.  The enclosed statement shows how we figured the deficiency.

If you want to contest this determination in court before making any payment, you have 90 days from the date of this letter (150 days if this letter is addressed to you outside of the United States) to file a petition with the United States (U.S.) Tax Court for a redetermination of the deficiency.  You can get a copy of the rules for filing a petition and a petition form you can use by writing to the address below:

United States Tax Court
400 Second Street, NW
Washington DC  20217

The Tax Court has a simplified procedure for small tax cases when the amount in dispute for **each** tax year is $50,000 or less.  If you intend to file a petition for multiple tax years and the amount in dispute for any one or more of the tax years exceeds

EXHIBIT F

$50,000, this simplified procedure is not available to you. If you use this simplified procedure, you cannot appeal the Tax Court's decision. You can get information pertaining to the simplified procedure for small cases from the Tax Court by writing to the court at the above address or from the court's internet site at www.ustaxcourt.gov.

Send the completed petition form, a copy of this letter, and copies of all statements and/or schedules you received with this letter to the Tax Court at the above address. The court cannot consider your case if you file the petition late. The petition is considered timely filed if the postmark date falls within the prescribed 90 or 150 day period and the envelope containing the petition is properly addressed with the correct postage.

The time you have to file a petition with the court is set by law and cannot be extended or suspended. Thus, contacting the Internal Revenue Service (IRS) for more information, or receiving other correspondence from the IRS won't change the allowable period for filing a petition with the Tax Court.

As required by law, separate notices are sent to husbands and wives. If this letter is addressed to both husband and wife, and both want to petition the Tax Court, both must sign and file the petition or each must file a separate, signed petition. If only one spouse petitions the Tax Court, the full amount of the deficiency will be assessed against the non-petitioning spouse. If more than one tax year is shown above, you may file one petition form showing all of the years you are contesting.

If you decide not to file a petition with the Tax Court, please sign the enclosed waiver form and return it to us at the IRS address on the top of the first page of this letter. This will permit us to assess the deficiency quickly and can help limit the accumulation of interest. The enclosed envelope is for your convenience.

If you decide not to sign and return the waiver, and you don't file a petition with the Tax Court within the time limit, the law requires us to assess and bill you for the deficiency after 90 days from the date of this letter (150 days if this letter is addressed to you outside the United States).

If you are a C corporation, under Internal Revenue Code Section 6621(c), large corporate underpayments may be subject to a higher rate of interest than the normal rate of interest for underpayments.

If you have questions about this letter, you may write to or call the contact person whose name, telephone number, and IRS address are shown on the first page of this letter. If you write, please include your telephone number, the best time for us to call you if we need more information, and a copy of this letter to help us identify your account. Keep the original letter for your records. If you prefer to call and the telephone number is outside your local calling area, there will be a long distance charge to you.

The contact person identified on the front of this letter can access your tax information and help you get answers. You also have the right to contact the office of the Taxpayer Advocate. You can call 1-877-777-4778 and ask for Taxpayer Advocate assistance. Or you can contact the Taxpayer Advocate for the IRS office that issued this notice of deficiency by calling (904) 665-1000 or writing to 400 West Bay Street, Room 535A, MS

TAS, Jacksonville, FL 32202.  Taxpayer Advocate assistance is not a substitute for established IRS procedures such as the formal appeals process.  The Taxpayer Advocate is not able to reverse legally correct tax determinations, nor extend the time fixed by law that you have to file a petition in the U.S. Tax Court.  The Taxpayer Advocate can, however, see that a tax matter that may not have been resolved through normal channels gets prompt and proper handling.

Thank you for your cooperation.

Sincerely,
Daniel I. Werfel
Principal Deputy Commissioner
By

Mark C Pettigrew
Supervisory Appeals Officer


Enclosures:
  Waiver
  Envelope
  Statement

# Securities Account Agreement Margin Account
## (Individual or Joint or Fiduciary Account)

| Sub Firm # | BR Code | FA Code | Account Number |
|---|---|---|---|
| 20 | F5 | F53C | -4169 |
| (Office Use Only) | | | |

BY SIGNING THIS AGREEMENT THE UNDERSIGNED CONSENT(S) AND AGREE(S) TO ALL THE TERMS AND CONDITIONS APPEARING BELOW AND ACKNOWLEDGE(S): 1. THE SECURITIES IN THE UNDERSIGNED'S MARGIN ACCOUNT MAY BE LOANED TO YOU OR LOANED OUT TO OTHERS. THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT, INCLUDING THE DISCLOSURES ON PAGE 5 AND 6.

**Account Registration**

Isaac Kodsi & Teresita M. Kodsi
Name of Account Holder or Authorized Person

| 4412 N BAY RD | MIAMI BEACH FL | 33140 |
|---|---|---|
| Street Address | City, State | ZIP Code |

Mailing address if different from above

| Signature | TIC Ownership % | (date) 9-5-12 | Print Name | Isaac Kodsi |
|---|---|---|---|---|
| Signature Second Party if Joint Account | TIC Ownership % | (date) 9/5/12 | Print Name | Teresita Menendez Kodsi |
| On File | | | | 9/6/12 |
| Social Security Number or Taxpayer Identification Number | | | Qualified Supervisor's Signature | Brion P. Lawler |

To Whom It May Concern:

In consideration of Wells Fargo Advisor, LLC ("hereinafter for this Agreement known as "WFA, LLC"), a separate, non-bank affiliate of Wachovia Corporation, a bank affiliate of Wells Fargo & Company accepting and agreeing to act as my broker and of First Clearing, LLC ("FCC"), also a separate, non-bank affiliate of Wells Fargo & Company, carrying the account(s) and extending credit on margin accounts of the undersigned, I agree to the following with respect to any of my accounts with you, in which I currently or in the future may have an interest, for the extension of credit for the purchase or sale of securities, options or other property. Throughout this Agreement, "I", "me", "my", "we", and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) above and all others who are legally obligated on this account. "You" and "your" refer to WFA, LLC and FCC, their subsidiaries and affiliates, their officers, directors, agents and employees. WFA, LLC and FCC are non-bank subsidiaries of Wells Fargo & Company. As used herein, the term "affiliate" of WFA, LLC means a bank affiliate Wells Fargo & Company and its subsidiaries and affiliates, including without limitation, FCC. Each of WFA, LLC and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. Where the context requires, the singular shall be the plural and the plural shall be the singular.

WELLS FARGO ADVISORS, LLC IS A SEPARATE, NON-BANK AFFILIATE OF WELLS FARGO & COMPANY. STOCKS, BONDS, MUTUAL FUNDS AND OTHER SECURITIES BOUGHT AND SOLD THROUGH WFA, LLC ARE NOT DEPOSITS OF ANY BANK AND ARE NOT INSURED OR OTHERWISE PROTECTED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), OR ANY OTHER GOVERNMENT AGENCY; ARE NOT AN OBLIGATION OF ANY BANK OR ANY AFFILIATE OF WFA, LLC; ARE NOT ENDORSED OR GUARANTEED BY WELLS FARGO & COMPANY, WFA, LLC, OR ANY BANK OR ANY AFFILIATE OF WFA, LLC; AND INVOLVE INVESTMENT RISK INCLUDING POSSIBLE LOSS OF PRINCIPAL. BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTOOD THE FOREGOING.

As set forth in the Disclosure Document and Designation of Responsibilities incorporated herein, I understand the role and services provided by WFA, LLC and FCC respectively and agree that this Agreement inures to the benefit of both firms and their affiliates as applicable.

**JOINT AND SEVERAL OBLIGATIONS –** If there's more than one individual signer, our obligations and ownership under this Agreement shall be *(check only one box)*:

☐ (a) We are tenants in common ("TIC"), each having an undivided interest therein unless a different tenancy percentage interest is indicated by our signature above.

☒ (b) We are joint tenants with right of survivorship and not tenants in common, so that in case of the death of any of us, the entire account shall become the property of the survivor or survivors.

☐ (c) We are the tenants by the entirety if married and permitted under state law so that in the case of the death of one of us the entire account shall become the property of the survivor.

(If none of the above boxes are marked, the provisions of (b) shall be effective.)

Whether we are joint tenants or tenants in common, or tenants by entirety, our liability hereunder shall be joint and several and our liability and all other obligations and agreements hereunder shall be binding upon our heirs, successors and assigns.

We ratify and confirm all transactions heretofore entered into for the said account by any of us.

542669 (Rev 19) Page 1 of 6

EXHIBIT G

We hereby authorize and instruct you to accept from any one of us any and all orders and instructions for and concerning the said account, as though all of us so ordered or instructed you jointly in regard to the following:

    (1) The purchase or sale (long or short) of securities, options, and/or commodities contracts.

    (2) The payment of money.

    (3) The registration and delivery of securities, options, and/or commodities contracts.

    (4) Any other action with respect to this account.

Payment of money may be made from time to time by delivering or sending to any one of us a check made payable in accordance with the registration of the account. Confirmations, notices, statements of account and communications of every kind with reference to said account may be sent or given by you to any one of us. In the event that you shall receive conflicting or inconsistent instructions from any one of us, you may follow any of such instructions at your will or you may refrain from executing any of such instructions until they shall have been reconciled in writing to your satisfaction, all without liability therefor to you.

We will give you immediate notice in writing of the death of any one of us. The estate of any one of us who shall have died shall be liable, and the survivor or survivors shall continue to be liable, jointly and severally, for any existing debit balance or loss in the account, or which you may later sustain, by reason of the completion of transactions initiated prior to the receipt by you of written notice of the death of any one of us, or incurred in the liquidation of the account. Payment or delivery of tenant in common interests upon death of tenant shall be in accordance with appropriate instructions at that time regardless of percentage ownership listed above.

This Agreement shall inure to the benefit of your successors and assigns and shall remain in effect until an authorized member of your firm shall acknowledge in writing the receipt of a written statement from one of us that he or she wishes to terminate the account, at which time the party giving such notice will not be bound for any further transactions made for the account thereafter. However, he or she shall remain bound for all prior transactions and for all further deliveries to any of us of any assets, in the account, and all communications regarding the account.

**RESTRICTED SECURITIES** – I agree that all securities (the "Transferable Securities") I deposit in my margin account as collateral for any margin loan that I may obtain from FCC are freely transferable and are not subject to any restrictions on resale under any applicable federal or state securities laws or otherwise, and are not "restricted", "Legend", or affiliate's "control" stock. Any securities subject to such restrictions are referred to as "Restricted Securities". If I deposit Restricted Securities in violation of this Agreement and I do not, upon demand, immediately replace such Restricted Securities with Transferable Securities satisfactory to you, or pay in full the margin loan secured by such Restricted Securities, I agree that I will be in default under this Agreement and you may take any and all of the following actions:

1) <u>Liquidate Collateral.</u> Liquidate any Transferable Securities or, to the extent permitted by law, any Restricted Securities held in my margin account, or any other account with you in which I have an interest, to satisfy the debit balance secured by the Restricted Securities;

2) <u>Set Off.</u> Set off against the debit balance secured by such margin loan any amounts held in any other accounts I maintain with you;

3) <u>Default Rate of Interest.</u> Until such time as the default is cured and in substitution for any other rate of interest specified in this Agreement, charge interest at the default rate of **24%** per annum on the debit balance of all margin accounts which I maintain with you and debit such accounts from time to time for such interest (provided, however, that I acknowledge that in no event do you intend to charge a rate of interest in excess of the maximum rate permitted by applicable law and, in the event such rate of interest is in excess of the permitted rate, you agree that any excess interest so charged shall at your option either be returned to me or applied to my account);

4) <u>Demand Immediate Payment.</u> Demand immediate payment in full of the margin loan secured by such Restricted Securities; or

5) <u>Other Remedies.</u> Assert any other remedies available to you under applicable law to collect all amounts that I owe you.

To the extent permitted by law, I also agree to pay your costs of collection, including reasonable attorney's fees incurred in enforcing any of your rights or collecting any amounts I owe you.

The provisions of the foregoing paragraph shall not apply to any Restricted Securities that have been approved for deposit in my margin account.

**NON-INDIVIDUAL CERTIFICATION** – If this is an agreement for a trust, other fiduciary account, or other non-individual account, I hereby certify and represent the use of a margin account and specifically the borrowing, lending, pledging of assets as described herein is in accordance with and authorized by the provisions of the trust or other instrument and/or applicable law governing the trust or entity.

**RULES AND REGULATIONS** – All transactions in my account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of the federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspensions of trading, war, acts of terrorism, or other conditions beyond our control.

**DEFINITION** – Under this Agreement, "securities, commodities and other property" includes, but is not limited to, money, securities and commodities of every kind and nature and all contracts, investments and options relating thereto, whether for present or future delivery.

**LIEN** – Whenever there is any existing or forthcoming indebtedness to you on my part, all orders, securities, commodities and other property now or hereafter held, carried or maintained by you in your possession and control for any purpose, in or for any of the accounts in my name now or hereafter opened, including any accounts in which I may have an interest, shall be subject to a lien for the discharge of all my indebtedness and other obligations to you in any of the said accounts. You shall have the right to cancel orders or transfer securities, commodities and other property held by you from or to any of the said accounts whenever you consider such a transfer necessary for your protection. In enforcing your lien, you shall have the discretion to determine which securities, commodities and property are to be sold and which contracts or orders are to be closed or cancelled, all without liability therefor to you.

**MARGIN MAINTENANCE AND DISCLOSURE REGARDING LIQUIDATION** – I agree to maintain such positions as required by all applicable statutes, rules, regulations, procedures and custom, or as you deem necessary or advisable. I agree to promptly satisfy all margin and maintenance calls. I understand that you are not obligated to request additional collateral from me in the event my account falls below margin maintenance requirements and there may be circumstances where you will liquidate securities and/or other property in the account without notice to me to ensure that margin requirements are satisfied. I agree that FCC may under certain circumstances charge interest at different rates including higher rates than listed in the Margin Disclosure section; such rates will be disclosed separately to me by FCC.

S

**LIQUIDATION -** You shall have the right, in accordance with your discretion regarding your margin maintenance requirements, which may be modified, amended or supplemented from time to time, or whenever you consider it necessary for your protection: to require additional collateral at an earlier or later point in time than called for by your general policies; to sell any or all securities, commodities and other property in the accounts which you, whether carried individually or jointly with others; to buy any or all securities, commodities or other property which may be short in my accounts; to cancel any open orders; and/or to close any or all outstanding contracts, without demand for margin or additional margin, notice of sale of purchase, or other notice or advertisement. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale; and you may be the purchaser for your own account. It is understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as herein provided. No WFA, LLC FA or branch personnel has any authority to waive or modify margin calls or postpone sell-outs or buy- ins.

**PAYMENT OF INDEBTEDNESS UPON DEMAND -** Debit balances represent money loaned to me. I shall at all times be liable for the full payment of debit balances or other obligations owing in my accounts with you, and I shall be liable to you for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by you or by me; and I shall make payment of such obligations and indebtedness promptly upon demand.

The reasonable costs and expenses of collection of the debit balance and any unpaid deficiency in my accounts with you, including attorneys' fees incurred and payable or paid by you, shall be payable to you by me promptly upon demand.

**PLEDGE OF SECURITIES, COMMODITIES AND OTHER PROPERTY -** All securities, commodities and other property held, carried or maintained by you in your possession in any of my accounts may be pledged and repledged by you from time to time, without notice to me, either separately or in common with other such securities, commodities and other property for any amount due in my accounts, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities, commodities and/or other property.

**COMMUNICATIONS -** Communications may be sent to me at the mailing address on file with you, or at such other address I may thereafter give in writing, and all communications so sent whether written by mail, telegraph, or otherwise shall be deemed to be given to me personally. The information set forth on all documents sent to me by you will be deemed conclusive unless objected to me within 10 days of its being provided.

**LIABILITY -** You shall not be liable in connection with the entering, execution, handling, selling or purchasing of securities or orders for my account except for gross negligence or willful misconduct on your part, nor shall you be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, acts of terrorism, strikes, failure of the mails or other communications systems, mechanical or electronic failure or failure of third parties to follow instructions or other conditions beyond your control.

**CROSS LIEN -** I hereby grant to you and all your affiliates a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**CREDIT CHECK -** I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any of your affiliates (including, without limitation, Wachovia Corporation) to share such information and any other confidential information you and such affiliate(s) may have about me and my accounts.

**BANKRUPTCY OR ATTACHMENT -** In the event that: (a) you are advised of my voluntary or involuntary application for protection under the applicable bankruptcy laws or the appointment of a receiver for me or (b) you are served with any lien, levy, garnishment or similar process with respect to me or my account, then you may, but are not required to, immediately take any action, which you, in your sole discretion shall deem necessary for your own protection, including without limitation, selling out any positions in my account to satisfy any obligations I have to you, with or without notice to me and without liability therefore.

**CORPORATE STRUCTURE/CONFLICTS OF INTEREST -** WFA, LLC is not a bank and is a separate and distinct corporate entity from its affiliated banks within Wachovia. Unless otherwise described of the confirmation, the obligations and commitments of WFA, LLC are not those of any affiliated bank and such bank is not responsible for securities purchased or sold by or through WFA LLC.

As a general matter, you or an affiliate may be a principal, may provide investment advice or may be engaged in underwriting, with respect to, or may purchase from or sell to an affiliate, those securities for which you are providing brokerage/advisory or other services to your customers. In addition, you or an affiliate may act as an investment advisor to issuers whose securities may be sold to customers. The timing and the nature of any action recommended by you may be different from the nature of any action taken or recommended by your affiliates and you are under no obligation to recommend or take any action recommended by any of your affiliates, including any purchase or sale of securities or other property undertaken by any affiliate, or any recommendations to customers of any such affiliate.

In particular, you and your affiliates and personnel may own, buy or sell for their accounts, or for client accounts for which they exercise investment discretion (including, but not limited to the Compass Advisory Program) any or all securities which are the subject of brokerage recommendations by the Portfolio Strategy Group. Purchases and sales for these accounts may not always be consistent with current Portfolio Strategy Group brokerage recommendations. Prior to conveying any buy or sell Portfolio Strategy Group brokerage recommendation to your clients at large, you may have acted upon the same advice for such accounts. The prices of these securities may be effected favorably or unfavorably by such trades or the subsequent issuance of the brokerage recommendations. Investors should consult their own investment professional as to their individual investment program.

In addition, from time to time, a bank affiliate of yours may lend money to an issuer of securities underwritten or privately placed or otherwise sold to you or your affiliates. The prospectus or other offering documents provided in connection with these transactions will disclose, to the extent required by applicable securities law, the existence of any material lending relationship by any affiliate of yours with such issuer and whether the proceeds of an issuance of securities will be used by the issuer to repay any outstanding indebtedness to any of your affiliates.

**JURISDICTION -** The laws of the State of New York, as applied to agreements signed and to be performed in New York, shall apply and bind the parties in any and all questions arising under this Agreement, including questions of validity, interpretation and performance.

**REPRESENTATIONS -** I represent that I have attained the age of majority under the laws of the state in which I reside, and if I am an employee of any exchange, or of any corporation which any exchange controls, or of a member of any firm registered on any exchange, or of a bank, trust company, insurance company or any corporation, firm or individual engaged in the business or dealing in securities either as broker or principal, that I will so notify you and will abide by the rules of the regulatory agencies and your policies. If at any future time, I become so employed, I will notify you promptly. No one other than the signed has or will have an interest in my account except as I shall advise you in writing.

**SEVERABILITY -** If any provision or condition of this Agreement shall be held to be invalid or unenforceable by any court, regulatory or self-regulatory agency or body, such invalidity or unenforceability shall attach only to such provision or condition. The validity of the remaining provisions and conditions shall not be affected thereby and this Agreement shall be valid and enforceable as if any such invalid unenforceable provision or condition were not contained herein.

**ELIGIBLE SECURITIES -** WFA, LLC may from time to time declare certain securities as ineligible for margin credit. WFA, LLC reserves the right, at it's sole discretion, not to extend margin on any security for any reason, or to change margin requirements at any time without notice to client.

# IMPORTANT - SEE MARGIN DISCLOSURE
# ON NEXT PAGE

4169WF 000005

SEP. 6. 2012  1:05PM    WACHOVIA SECURITIES LLC                    NO. 3152    P. 6/7

## Margin Disclosure Statement

### IT IS IMPORTANT THAT YOU READ AND UNDERSTAND THIS INFORMATION PRIOR TO OPENING A MARGIN ACCOUNT.

Wells Fargo Advisors, LLC, Wells Fargo Advisors Financial Network, LLC and First Clearing, LLC (hereinafter collectively referred to as "WFA") are furnishing this document to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. Before trading stocks in a margin account, you should carefully review the margin agreement provided by WFA. Please consult your Financial Advisor regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price through WFA. If you choose to borrow funds from WFA, you will open a WFA margin account. The securities purchased are the collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, WFA can take action, such as issue a margin call and/or sell securities or other assets in any of your accounts held with WFA, in order to maintain the required equity in the account.

It is important that you fully understand the risks involved in trading securities on margin. These risks include the following:

- **You can lose more funds than you deposit in the margin account.** A decline in the value of securities that are purchased on margin may require you to provide additional funds to WFA, which has made the loan(s), to avoid the forced sale of those securities or other securities or assets in your account(s).

- **WFA can force the sale of securities or other assets in your account(s).** If the equity in your account falls below the maintenance margin requirements or our higher "house" requirements, WFA can sell the securities or other assets in any of your accounts held with us to cover the margin deficiency. You also will be responsible for any shortfall in the account after such a sale.

- **WFA can sell your securities or other assets without contacting you.** Some investors mistakenly believe that firms such as WFA must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. While we will try to notify you of margin calls, we are not required to do so. However, even if we have notified you and provided a specific date by which you can meet a margin call, we can still take necessary steps to protect our financial interests, including immediately selling the securities without notice to you.

- **You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call.** Because the securities are collateral for the margin loan, WFA has the right to decide which security to sell in order to protect our interests.

- **WFA can increase its "house" maintenance margin requirements at any time and is not required to provide you advance written notice.** These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause us to liquidate or sell securities in your account(s).

- **You are not entitled to an extension of time on a margin call.** While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have a right to the extension.

---

*Securities in your margin account may be loaned to or by WFA. To the extent WFA determines, in accordance with Federal tax regulations, that your securities have been loaned, payments received by you with respect to such securities (including payments in lieu of dividends) may be reclassified as substitute payments. Substitute payments may be reported on different tax reporting forms than payments received on the underlying securities and may be subject to different tax consequences and rates. You are advised to contact your tax advisor to discuss the tax treatment of substitute payments.*

*Your Financial Advisor may receive compensation based on the amount of your margin loans, which may take the form of a percentage of your margin balances or the interest you pay on an ongoing basis.*

---

SEP. 6. 2012  1:05PM    WACHOVIA SECURITIES LLC    NO. 3152    P. 7/7

# Statement of Interest Charges

## Accounts on which Interest is charged • Calculation of Interest • Lien and Collateral

To assist you in managing your borrowing needs and to familiarize you with the terms under which credit is extended on your account, we have developed this Statement of Interest Charges. Please review the explanation of applicable interest rate charges prior to establishing a margin position.

### Accounts on which Interest is Charged

Payments for purchases in cash accounts should be received on or before the settlement date shown on the trade confirmation. If your payment is received after that date, a late payment charge may be posted to your cash account.

Disbursement for a sale in a cash account is not required to be made prior to the settlement date displayed on the confirmation of the transaction.

Occasionally, we may honor your request to receive payment of the sale proceeds prior to the due date.

If this privilege is utilized, an interest charge may be posted to your account. Interest may be charged on margin credit extended for the purpose of purchasing, carrying or trading in securities. Interest charged is calculated on a settlement date basis and the detail supporting the calculation will be displayed on your monthly statement.

### Calculation of Interest

Your annual rate of interest will vary depending on the size of your daily adjusted debit balance. The adjusted debit balance is the net total of the settled balances in your cash and margin accounts, first reduced by any available free credit balances in your cash account.

Short positions are "marked-to-market" daily. Since the security sold short must be borrowed in order to deliver it to the buying broker, the credit that results from the sale is not available to you. The market value of the short sale is debited against your margin balance to arrive at an adjusted debit balance for interest purposes. The daily closing price is used to determine any appreciation or depreciation of a security sold short which will then adjust your daily net balance.

The annual rate of interest applicable to your account will be computed using a selected rate above, at, or below our Base Rate ("Base Rate"). The Base Rate is set at our discretion with reference to commercially recognized interest rates, industry conditions relating to the extension of margin credit and general credit market conditions. The annual rate of interest will change without prior notice to you, in accordance with changes in our Base Rate.

The table of interest rates is as follows:

| Margin Debit Balance | Rate of Interest |
|---|---|
| $0 to $24,999.99 | Base Rate + 3.625% |
| $25,000 to $49,999.99 | Base Rate + 2.500% |
| $50,000 to $99,999.99 | Base Rate + 2.375% |
| $100,000 to $249,999.99 | Base Rate + 0.750% |
| $250,000 to $499,999.99 | Base Rate + 0.625% |
| $500,000 to $999,999.99 | Base Rate + 0.500% |
| $1,000,000 to 4,999,999.99 | Base Rate |
| $5,000,000 to 9,999,999.99 | Base Rate - 0.500% |
| $10,000,000 and above | Base Rate - 0.750% |
| **Unpaid Cash Account Balance** | Base Rate + 3.625% |

Interest is computed daily on the basis of a 360 day year using the following formula:

| Adjusted Debit Balance 1 | x | Interest Rate 100 | x | Number of Days 360 |
|---|---|---|---|---|

### Lien and Collateral

You agree to satisfy promptly all margin and maintenance calls. Should your account fall below minimum maintenance requirements, WFA may liquidate securities, commodities and/or other property in your Account, or any other account with WFA or our affiliates in which you have an interest, without notice to you, to ensure that minimum maintenance requirements are satisfied.

542669 (Rev 19) Page 6 of 6

4169WF6600000713

## JOINT TENANCY WITH RIGHT OF SURVIVORSHIP; TENANCY BY THE ENTIRETY



| Sub Firm # | BR Code | FA Code | Account Number |
|---|---|---|---|
| 20 | F5 | F53C | '-4169 |

We agree that each of us shall have authority on behalf of our account to:

(1) buy, sell (including short sales), and otherwise deal in bonds and other securities and commodities, on margin or otherwise;

(2) receive demands, notices, confirmations, reports, statements, and communication of every kind;

(3) to receive and dispose of money, securities and property of every kind;

(4) to make any types of agreements relating to any of the above, and to terminate or modify such agreements or waive any of their provisions; and

(5) generally deal with you as fully and completely as if one of us alone were interested in our account, without notice to the other person(s) listed on our account.

You are authorized to follow the instructions of any one of us concerning our account and to make deliveries of any securities or payments of any monies in our account to any one of us, even if such deliveries and/or payments are made to one of us personally and not for the benefit of all of us. You are under no duty to inquire into the purpose or propriety of any such demand for delivery or payment.

All of us are liable to you with respect to actions any one of us may make with regards to our account. We agree that all property you may be holding for any one or more of us may be subject to a lien in your favor with regards to any obligations we have to you, such as unpaid fees. This lien is not a substitution of any other rights or remedies you otherwise may have.

We agree that if any of us dies, the survivor(s) must immediately provide you with written notice of the death. Before or after receiving such notice, you may require any type of estate documentation or retain such portion of and/or restrict transactions in our account as you deem advisable to protect yourself against any tax, liability, penalty or loss. The estate and each survivor will be liable to you for any net debit balance or loss (a) resulting from the completion of transactions initiated prior to receipt of the written notice of death, or (b) incurred during the liquidation of our account or the adjustment of our interests in our account.

In the event of the death of either or any of us, the entire interest in the Joint Account shall be vested in the survivor or survivors on the same terms and conditions as stated in this document, without in any manner releasing the estate from any liability described above.

Even though we have granted you broad authority in this document, you may at any time, in your sole discretion and without liability to us, require collective action by us with respect to any matter concerning our account. If you receive conflicting instructions from any of us, you are authorized, in your sole discretion and without liability to us, to do any one or more of the following: (a) select which set of instructions to follow and which to disregard; (b) suspend all activity in our account, refuse to buy, sell or trade any security or commodity, or refuse to disburse any monies, securities, or properties, except upon further written instructions signed by all of us; (c) close our account and send securities, monies or other property by ordinary mail to the address of record; or (d) file an interpleader action in any appropriate court, in which event you would be entitled to recover all costs, including reasonable attorney's fees.

All notices or communications to us are to be directed to the latest address furnished or confirmed to you in writing by any one of us.

Our account is presumed to be a joint tenancy with the right of survivorship, unless we indicate that it is a tenancy by the entirety by checking the appropriate box below. We understand and agree that you will not provide any legal or tax advice regarding which type of account designation is appropriate for us. If we have designated our account as a tenancy by the entirety, then we represent that this form of account ownership is available in our state of domicile. We also acknowledge that regardless of our account's designation, our account will be treated the same by you. For a tenancy by the entirety account or for a joint tenancy with right of survivorship account between married individuals, the survivorship feature will remain on our account, even if we divorce, unless you have received specific notice from us, informing you that the tenancy by the entirety and/or survivorship between us has been terminated by court order and/or operation of law.

Type of Account (check one):

☒ Joint Tenancy with Right of Survivorship          ☐ Tenancy by the Entirety

Date: _____ 9-5-62 _____

Signatures:

X _____          X _____

X _____          X _____

556563 (Rev 06)  Page 1 of 1

EXHIBIT H

# Signature Page

ISAAC KODSI &
TERESITA M KODSI JT WROS
4412 N BAY RD
MIAMI BEACH FL 33140-2857

| Sub Firm # | 20 | BR Code | F5 | FA Code | F53C | Account Number | 4169 |
|---|---|---|---|---|---|---|---|

**BY SIGNING THIS PAGE, I/WE ("I") ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED A COPY OF MY/OUR INVESTMENT PROFILES(S) INCLUDED IN THIS PACKAGE AND, IN THE CASE OF AN ADVISORY PROGRAM ACCOUNT, THE DISCLOSURE DOCUMENT(S) RELATING TO MY PARTICULAR ADVISORY PROGRAM ACCOUNT, AND I HAVE READ AND AGREE TO BE BOUND BY THE AGREEMENTS AND/OR DOCUMENTS LISTED BELOW AND ANY OTHER AGREEMENTS AND DOCUMENTS THAT ARE INCORPORATED BY REFERENCE INTO SUCH AGREEMENTS AND/OR DOCUMENTS.**

400 – Asset Advisor Agreement – CSA1

I understand and acknowledge that investments and insurance products in my brokerage account:
- are NOT insured by the FDIC or any other federal government agency
- are NOT obligations or deposits of or guaranteed by any Wells Fargo Bank or by any Bank affiliate
- involve investment risk, including possible loss of principal

I agree to promptly review and immediately advise Wells Fargo Advisors if any of the Owners and/or Account Profile information is not accurate or becomes inaccurate. I understand that Wells Fargo Advisors will rely on this information and that it is my responsibility to provide accurate and timely updates. My failure to do so may affect recommendations that are given to me related to investments in my Account. If I decide to close or make changes to my Account, I will provide notification to Wells Fargo Advisors.

**TRANSACTION CONFIRMATION WAIVER – DISCRETIONARY ADVISORY PROGRAM ACCOUNTS**
By initialing here, I waive receipt of trade-by-trade confirmations and understand that waiving this right is not a condition of participating in the Program and will not result in a different fee. I may rescind my waiver at any time and may request, for no additional cost, confirmations for any transactions effected for up to one year preceding my last statement. See Client Agreement, Confirmations and Reports.

BY SIGNING THIS SIGNATURE PAGE, I/WE AUTHORIZE, ACKNOWLEDGE AND AGREE TO THE TERMS AND CONDITIONS OF THE CLIENT AGREEMENT AND TO THE FOLLOWING:
- **Margin:** If this is a Margin Account, my securities may be loaned to First Clearing, LLC or loaned to others.
- **Communications Consent:** My Financial Advisor may contact me/us as described in Section I, paragraph 4 of the Client Agreement
- **Command Asset Program Accountholders:** In connection with the Command Asset Program, Wells Fargo Bank, N.A. may establish a Bank Account in my/our name(s) and provide the banking-related services under the terms set forth in the Command Agreement and may make any inquiry it considers appropriate, including credit or other reports, to determine if the Bank Account should be opened. *I/we also agree to the terms of the dispute resolution program described in the Command Agreement relating to disputes specifically involving the Bank Account.*
- **Joint Account Holders with Rights of Survivorship in Alabama, North Carolina, Tennessee, Texas and Virginia Only:** The persons signing below agree with each other and Wells Fargo Advisors that this account is a joint account with right of survivorship and that on the death of one party to a joint account all sums in the account on the date of death vest in and belong to the surviving party as his or her separate property and estate. Each person signing below who is married to a person who is not also signing below represents and warrants that no assets now or hereafter deposited to the account, nor any interest earned on such assets, are subject to the management, control or disposition (jointly or otherwise) of such person's spouse.

— **MUST SIGN AND DATE** —

I agree to the terms and conditions of this agreement.

| Signature of X (Primary Owner) Use BLACK ink only. | Title if Applicable | Date *(Required)* 9-5-12 |
|---|---|---|

I agree to the terms and conditions of this agreement.

| Signature of X | Title if Applicable | Date *(Required)* 9/5/12 |
|---|---|---|
| Signature of X | Title if Applicable | Date *(Required)* |
| Signature of X | Title if Applicable | Date *(Required)* |
| Signature of X | Title if Applicable | Date *(Required)* |

**Please keep one set for your records and return the other entire set in the postage-paid envelope provided.**

Investment and Insurance Products:

| Not Insured by FDIC or any Federal Government Agency | May Lose Value | Not a Deposit of or Guaranteed by a Bank or Any Bank Affiliate |
|---|---|---|

Wells Fargo Advisors, LLC is a registered broker-dealer and separate non-bank affiliate of Wells Fargo & Company
BA1 589138 (Rev 02 - 06/12)

Form Code: WFGESGN

WFGESGN 003529256001

10044169

# Signature Page

ISAAC KODSI &
TERESITA M KODSI JT WROS
4412 N BAY RD
MIAMI BEACH FL 33140-2857

| Sub Firm # | BR Code | FA Code | Account Number |
|---|---|---|---|
| 20 | F5 | F53C | -4169 |

**BY SIGNING THIS PAGE, I/WE ("I") ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED A COPY OF MY/OUR INVESTMENT PROFILES(S) INCLUDED IN THIS PACKAGE AND, IN THE CASE OF AN ADVISORY PROGRAM ACCOUNT, THE DISCLOSURE DOCUMENT(S) RELATING TO MY PARTICULAR ADVISORY PROGRAM ACCOUNT, AND I HAVE READ AND AGREE TO BE BOUND BY THE AGREEMENTS AND/OR DOCUMENTS LISTED BELOW AND ANY OTHER AGREEMENTS AND DOCUMENTS THAT ARE INCORPORATED BY REFERENCE INTO SUCH AGREEMENTS AND/OR DOCUMENTS.**

040 - Client Agreement
020 - New Account Application, WBS - 1001
024 - Supplemental Account Owner Documentation - 1096
280 - New Command Asset Program Confirmation - 3020

I understand and acknowledge that investments and insurance products in my brokerage account:
- are NOT insured by the FDIC or any other federal government agency
- are NOT obligations or deposits of or guaranteed by any Wells Fargo Bank or by any Bank affiliate
- involve investment risk, including possible loss of principal

I agree to promptly review and immediately advise Wells Fargo Advisors if any of the Owners and/or Account Profile information is not accurate or becomes inaccurate. I understand that Wells Fargo Advisors will rely on this information and that it is my responsibility to provide accurate and timely updates. My failure to do so may affect recommendations that are given to me related to investments in my Account. If I decide to close or make changes to my Account, I will provide notification to Wells Fargo Advisors.

**TRANSACTION CONFIRMATION WAIVER - DISCRETIONARY ADVISORY PROGRAM ACCOUNTS**
By initialing here, I waive receipt of trade-by-trade confirmations and understand that waiving this right is not a condition of participating in the Program and will not result in a different fee. I may rescind my waiver at any time and may request, for no additional cost, confirmations for any transactions effected for up to one year preceding my last statement. See Client Agreement, Confirmations and Reports.

**BY SIGNING THIS SIGNATURE PAGE, I/WE AUTHORIZE, ACKNOWLEDGE AND AGREE TO THE TERMS AND CONDITIONS OF THE CLIENT AGREEMENT AND TO THE FOLLOWING:**

- **Margin:** If this is a Margin Account, my securities may be loaned to First Clearing, LLC or loaned to others.
- **Communications Consent:** My Financial Advisor may contact me/us as described in Section I, paragraph 4 of the Client Agreement.
- **Command Asset Program Account holders:** In connection with the Command Asset Program, Wells Fargo Bank, N.A. may establish a Bank Account in my/our name(s) and provide the banking-related services under the terms set forth in the Command Agreement and may make any inquiry it considers appropriate, including in credit or other reports, to determine if the Bank Account should be opened. I/we also agree to the terms of the dispute resolution program described in the Command Agreement relating to disputes specifically involving the Bank Account.
- **Joint Account Holders with Rights of Survivorship in Alabama, North Carolina, Tennessee, Texas and Virginia Only:** The persons signing below agree with each other and Wells Fargo Advisors that this account is a joint account with right of survivorship and that on the death of one party to a joint account all sums in the account on the date of death vest in and belong to the surviving party as his or her separate property and estate. Each person signing below who is married to a person who is not also signing below represents and warrants that no assets now or hereafter deposited to the account, nor any interest earned on such assets, are subject to the management, control or disposition (jointly or otherwise) of such person's spouse.

| W-9: | Under penalties of perjury, I certify that: |
|---|---|
| **Payer's Request for Taxpayer Identification Number**<br>Requester: First Clearing, LLC<br>One North Jefferson, St. Louis, MO 63103<br>Is this your correct Social Security/Tax ID?<br>If not, please enter the correct number in the appropriate boxes.<br><br>[X] Social Security    [0370]<br>[ ] Tax ID<br>or [ ] Corrected<br>Social Security/<br>Tax ID<br>(Please omit dashes) | 1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me); and<br>2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and<br>3) I am a U.S. citizen or other U.S. person.<br>You must cross out item 2) above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return.<br>[ ] Exempt Payee (please check, if an applicable entity) |

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

THIS CLIENT AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE LOCATED ON PAGE 4 IN SECTION I, PARAGRAPHS 5 AND IN THE WELLS FARGO ADVISORS GENERAL ACCOUNT AGREEMENT AND DISCLOSURE DOCUMENT ON PAGE 5, PARAGRAPH 5 UNDER THE HEADER "ARBITRATION." THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THE CLIENT AGREEMENT AND THE WELLS FARGO ADVISORS GENERAL ACCOUNT AGREEMENT AND DISCLOSURE DOCUMENT AND HEREBY AGREES TO THE TERMS OF THESE AGREEMENTS.

## MUST SIGN AND DATE

I agree to the terms and conditions of this agreement and attest that the certification made of the W-9 above are true.

| Signature of ISAAC KODSI | (Primary Owner) Use BLACK ink only. | Title if Applicable | Date (Required) 9-5-12 |
|---|---|---|---|
| X | | | |

I agree to the terms and conditions of this agreement.

| Signature of TERESITA MENENDEZ KODSI | | Title if Applicable | Date (Required) 9/5/12 |
|---|---|---|---|
| X | | | |

| Signature of | | Title if Applicable | Date (Required) |
|---|---|---|---|
| X | | | |

| Signature of | | Title if Applicable | Date (Required) |
|---|---|---|---|
| X | | | |

| Signature of | | Title if Applicable | Date (Required) |
|---|---|---|---|
| X | | | |

**Investment and Insurance Products:**

| Not Insured by FDIC or any Federal Government Agency | May Lose Value | Not a Deposit of or Guaranteed by a Bank or Any Bank Affiliate |
|---|---|---|

Wells Fargo Advisors, LLC is a registered broker-dealer and separate non-bank affiliate of Wells Fargo & Company
579926 (Rev 06 - 06/12)

10044169  WFGESG00236286300014

## SCHEDULE 1

| Payor | Statement Clearing Date | Type | Check # | Payment Amount |
|---|---|---|---|---|
| Kodsi, Eisenstein & Associates PA[4] | 5/11/2010 | Check | 1384 | 27,902.65 |
| Isaac Kodsi | 3/31/2010 | Check | 1331 | 27,759.62 |
| Isaac Kodsi | 6/16/2010 | Check | 1349 | 28,594.15 |
| Isaac Kodsi | 7/14/2010 | Check | 1360 | 28,890.50 |
| Isaac Kodsi | 8/10/2010 | Check | 1364 | 29,622.40 |
| Isaac Kodsi | 9/17/2010 | Check | 1379 | 30,618.53 |
| KIT DBA Ark Financial Group | 12/9/2010 | Wire | | 31,610.82 |
| KIT DBA Ark Financial Group | 12/28/2010 | Wire | | 38,820.89 |
| KIT DBA Ark Financial Group | 1/12/2011 | Wire | | 64,950.61 |
| Isaac Kodsi & Teresita Menendez Kodsi | 2/15/2011 | Check | 103 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 3/8/2011 | Check | 122 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 4/15/2011 | Check | 146 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 5/16/2011 | Check | 157 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 6/16/2011 | Check | 181 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 7/14/2011 | Check | 195 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 8/15/2011 | Check | 208 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 9/16/2011 | Check | 228 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 10/18/2011 | Check | 251 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 11/16/2011 | Check | 274 | 32,607.59 |

---

[4] Kodsi, Eisenstein & Associates, P.A. (**"KEA"**), is the previous name of the Debtor's law firm. Although not having done business since 2002, the Debtor kept KEA's trust account opened. In 2009 and 2010, the Debtor deposited over $2,400,000 of his monies into the KEA trust account to keep such monies out of the reach of his creditors. The transfers made by the Debtor out of the KEA trust account will be the subject of additional adversary proceedings, not only against the Debtor and Tera, but also third-parties. Needless to say, all transfers out of the KEA trust account (including the transfer to pay Northern Trust Bank) were made with intent to hinder, delay, and defraud the Debtor's creditors.

| | | | | |
|---|---|---|---|---|
| Isaac Kodsi & Teresita Menendez Kodsi | 12/14/2011 | Check | 282 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 2/14/2012 | Check | 321 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 3/15/2012 | Check | 333 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 4/18/2012 | Check | 358 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 5/16/2012 | Check | 369 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 6/12/2012 | Check | 385 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 7/12/2012 | Check | 400 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 8/14/2012 | Check | 415 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 9/7/2012 | Check | 435 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 10/16/2012 | Check | 459 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 11/14/2012 | Check | 465 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 12/17/2012 | Check | 486 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 1/15/2013 | Check | 490 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 2/15/2013 | Check | 510 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 3/15/2013 | Check | 519 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 4/12/2013 | Check | 526 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 5/14/2013 | Check | 545 | 32,607.59 |
| Isaac Kodsi & Teresita Menendez Kodsi | 6/12/2013 | Check | 557 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 7/12/2013 | Check | 565 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 8/15/2013 | Check | 579 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 9/16/2013 | Check | 586 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 10/15/2013 | Check | 600 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 12/12/2013 | Check | 624 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 1/9/2014 | Check | 636 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 2/11/2014 | Check | 657 | 27,505.45 |
| Isaac Kodsi & Teresita Menendez Kodsi | 3/14/2014 | Check | 794 | 27,505.45 |
| Teresita Menendez Kodsi | 1/17/2012 | Check | 139 | 32,607.59 |
| Teresita Menendez Kodsi | 11/19/2013 | Check | 100 | 27,505.45 |

**Exhibit 1**

# Mailing Information for Case 14-01830-LMI

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- Howard D. Dubosar    hdubosar@dubosarnavon.com, RSheres@dubosarnavon.com;KDoyle@dubosarnavon.com;TNovak@dubosarnavon.com
- Daniel Gielchinsky    dan@dyglaw.com
- Daniel N Gonzalez    dgonzalez@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com
- Lawrence E Pecan    lpecan@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com